730 So.2d 485 (1999)
STATE of Louisiana
v.
Michael WRIGHT
No. 98 KA 0601.
Court of Appeal of Louisiana, First Circuit.
February 19, 1999.
*486 Walter P. Reed, District Attorney, Covington, LA, and Dorothy Pendergrast, Metairie, LA, for appellee State of Louisiana.
Frank Sloan, Covington, LA, for defendant-appellant Michael Wright.
BEFORE: FOIL, KUHN, and WEIMER, JJ.
WEIMER, J.
The defendant, Michael Wright, and his sister, Helen Burns (hereinafter referred to as "Burns"), were charged by grand jury indictment # 255875 with one count of second degree murder, a violation of LSA-R.S. 14:30.1, for the shooting death of Conway Burns, Burns' husband. Wright pled not guilty.[1] Originally, only Burns was indicted for the offense under grand jury indictment # 245264, but that indictment was nolle prosequi.
After a jury trial with Burns as co-defendant, Wright was found guilty as charged. Wright's motions for post-verdict judgment of acquittal and for new trial were denied. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He now appeals, designating two assignments of error.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number one, Wright contends the circumstantial evidence was insufficient to support the verdict against him.
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438. State v. Huls, 95-0541, p. 25 (La.App. 1 Cir. 5/29/96), 676 So.2d 160, 176, writ denied, 96-1734 (La. 1/6/97), 685 So.2d 126. Where the key issue is the defendant's identity as the perpetrator, rather than whether or not the crime was committed, the *487 State is required to negate any reasonable probability of misidentification. Positive identification by only one witness may be sufficient to support the defendant's conviction. State v. Parfait, 96-1814, p. 17 (La. App. 1 Cir. 5/9/97), 693 So.2d 1232, 1242, writ denied, 97-1347 (La. 10/31/97), 703 So.2d 20.
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Huls, 95-0541 at 25, 676 So.2d at 176-177.
The applicable definition of second degree murder in the instant case is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." LSA-R.S. 14:30.1(A)(1). Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Intent is a question of fact. Nevertheless, the intent at issue in this case, specific criminal intent, may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Seals, 95-0305, p. 6 (La. 11/25/96), 684 So.2d 368, 373, cert. denied, 520 U.S. 1558, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanan, 95-0625, p. 4 (La.App. 1 Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So.2d 923. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. Seals, supra. All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principles. LSA-R.S. 14:24.
Wright and Burns were tried jointly, and the following evidence was presented to the jury. Martha Burghardt testified that on June 23, 1995, at approximately noon, she was at her home on Highway 36 cleaning dishes at the kitchen sink. She looked up after hearing a noise, which at first she thought was a car accident. She saw two people fighting near a white van and a "little red car." She then saw one of the individuals go to the red car and retrieve a gun. The person held the gun "like halfway out the car door" and fired. She commented, "Boy, he really wants that person dead." She had no telephone, so after waiting for the shooter to leave, she flagged-down a pickup truck and asked the driver to alert an ambulance and the police. She did not see the faces of the two people and could not determine their skin color. When asked if she had seen Michael Wright at the crime scene, she answered "No." She testified before the grand jury that she thought the two persons were male because they were dressed in jeans, but conceded that it could have been a man and a woman in jeans or two women in jeans. The only times that she had seen Burns was before the grand jury and in the courtroom during trial.
Robbie Anthony testified that on the date in question, he was at his desk in his business located on Highway 59, at the red light in Abita Springs. He looked out of the window after hearing a gunshot. He saw a white van with a "little red car" behind it "with a person out the window." He saw an anxious and nervous African-American male driving the van and an African-American male in the red car pointing a gun towards the van. The driver of the van turned left and stopped near an Abita police officer, but then drove off. While Mr. Anthony saw the faces of both drivers, he could not identify Michael Wright as being the person in the red vehicle.
On redirect examination, the State asked Mr. Anthony whether he was saying that Wright was not the man in the red vehicle or whether he was saying that he could not say whether Wright was or was not the man in *488 the red vehicle. Mr. Anthony answered that he could not say whether Wright was or was not the man in the red vehicle.
Zachary Sloan testified that on June 23, 1995, at approximately noon, he was driving home on Highway 36 to have lunch. As he parked in his driveway, he noticed a white van parked sideways in the middle of the road. Two men were struggling on the side of the van. One of the men got up. He was a black man, 5'11"-6' tall, wearing a white sleeveless T-shirt and blue sweat pants. As Mr. Sloan was closing his gate, he looked over at the man and saw his arms go out, saw the man hunch over, and heard five gunshots. Mr. Sloan turned to run into his house to call the police. As he turned, he saw two people come around the back of the van and get into "a little red foreign car." Mr. Sloan did not see anyone's face, did not see the weapon, and his entire view of the incident lasted approximately fifteen seconds.
Approximately fifteen minutes after the police arrived and approximately thirty minutes after the shooting, Mr. Sloan saw someone matching the description of the shooter "coming down the street" from about two blocks away. The person was coming from the same neighborhood that Mr. Sloan "believed" the red car had turned into. He identified Michael Wright as the person matching the description, commenting that he had gone to school with Wright and had played football with him in the eighth grade.
Mr. Sloan testified that Wright looked like the shooter to him because of Wright's physical appearance, but he could not say for sure because he never saw the shooter's face. He also testified that he could not be certain of the shooter's gender because he never saw that person from the front. When questioned by the State regarding whether his feelings about Wright's identity as the shooter were different at the time of his grand jury testimony, Mr. Sloan replied:
No, my feelings have never changed as to what I saw. And to the physical appearance of the person that I saw and that it looked like the same person to me. But I couldn't tell you for sure because I never saw their face. That would be the, in my mind, the only positive identifying factor to make it one hundred percent.
On cross-examination, Mr. Sloan conceded that he could not identify Wright as the shooter, that the shirt the shooter had worn was "fairly popular or common," and that the sweat pants the shooter had worn "you could get at Wal-Mart any time." He also agreed that when he "bumped into" Wright on two occasions after the day of the shooting, he neither threatened nor seemed antagonistic towards him.
In addition to Mr. Sloan's testimony at trial, the State also relied upon Mr. Sloan's testimony before the grand jury to prove Wright's identity as the shooter. Mr. Sloan's grand jury testimony was placed into evidence by counsel for Burns, but was also used by counsel for both Wright and the State. The portions of Mr. Sloan's grand jury testimony relied upon by the State were as follows:
The witness: The only way I can identify this individual was the fact that I had seen him out there in front of the van, and then he caught my eye when he was coming back down the street later and that I had gone to school with him. And that's the only way I can place him; otherwise I wouldn't have any idea who he was.
. . . .
Q. You said that you knew Michael Wright from school. What grade approximatelystarting from what grade on?
A. Second grade.
Q. Second grade on?
A. Correct.
Q. You're now 34?
A. Yes.
Q. So, for close to 30 years
A. Second grade, andI don't know whenthen he dropped out of school sometime. I played on a football team my mom and dad had gotten up so I could play football. It was a city team that they developed, and he was on that team. He'd help my mom out a good bit with the team, you know, with the equipment and playing and everything. And I was really surprised to see what I saw.

*489 Q. Is there any doubt in your mind that the person you saw was Michael Wright?
A. No doubt.
Grand Juror: So Michael was walking up the street toward the deal with another guy?
The witness: Correct. But the only person that I saw, other than the guy that got shot, out there in front of thaton the other side of that van was the individual I described to you that I believe to be Michael Wright. Believe me, I thought long and hard about coming up here and saying something like this.
Mr. Sloan's grand jury testimony qualifies as non-hearsay pursuant to LSA-C.E. art. 801(D)(1)(c), as a statement "of identification of a person made after perceiving the person." There has been little state jurisprudence concerning LSA-C.E. art. 801(D)(1)(c). However, in State v. Harper, 27,278 (La.App. 2 Cir. 8/23/95), 660 So.2d 537, writ denied, 95-2318 (La. 1/12/96), 666 So.2d 320, the court addressed whether testimony at trial from two police officers concerning a witness' prior identification of the defendant was admissible where, at trial, the witness testified she could not identify the defendant. The court held that pursuant to LSA-C.E. art. 801(D)(1)(c), the testimony concerning the prior identification was non-hearsay and any discrepancy between that identification and the in-court identification testimony was a matter for the jury to weigh. Harper, 27,278 at 13, 660 So.2d at 545.
Louisiana Code of Evidence article 801(D)(1)(c) was originally modeled upon, and later amended to conform with, Fed. R.Evid. 801(d)(1)(C).[2]See LSA-C.E. art. 801(D)(1) official comment (c); LSA-C.E. art. 801(D)(1)(c); 1995 La.Acts No. 1300, § 1; Fed.R.Evid. 801(d)(1)(C). Thus, the federal legislative intent in enacting Fed. R.Evid. 801(d)(1)(C) and the federal jurisprudence interpreting the rule are highly instructive.
The Supreme Court has recognized that with Fed.R.Evid. 801(d)(1)(C), Congress made a decision to favor more contemporaneous identification testimony over courtroom identifications on the theory that "[a]s time goes by, a witness' memory will fade and his identification will become less reliable[.]" United States v. Owens, 484 U.S. 554, 562, 108 S.Ct. 838, 844, 98 L.Ed.2d 951 (1988), citing H.R.Rep. No. 94-355, P. 3 (1975). Additionally, the Second Circuit has recognized that Fed.R.Evid. 801(d)(1)(C) was enacted "to permit the introduction of identifications made by a witness when memory was fresher and there had been less opportunity for influence to be exerted upon him." United States v. Marchand, 564 F.2d 983, 996 (2d Cir.1977), cert. denied, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). That same circuit has specifically interpreted Fed.R.Evid. 801(d)(1)(C) to allow into evidence an out-of-court identification that was inconsistent with an in-court identification. United States v. Lewis, 565 F.2d 1248, 1252 (2d Cir.1977), cert. denied, 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978). That was also the interpretation of the Seventh Circuit in United States v. O'Malley, 796 F.2d 891, 899 (7th Cir.1986). Further, multiple federal circuits have held that previous identification testimony admitted into evidence pursuant to Fed.R.Evid. 801(d)(1)(C) is available not simply for impeachment, but as substantive evidence. O'Malley, 796 F.2d at 899; Marchand, 564 F.2d at 985.
In the instant case, we note that the State suggested to the jury, and the jury apparently accepted, that Mr. Sloan had "back[ed] off a little bit" from his identification of Michael Wright as the shooter since testifying before the grand jury because of fear of reprisal. The State pointed out that Mr. Sloan knew *490 that Wright was aware of where he (Mr. Sloan) lived because he had been unhooking his gate at the time of the offense. The State also pointed out that Mr. Sloan had encountered Wright on at least two occasions prior to trial after he (Mr. Sloan) had "fingered" Wright for murder before the grand jury.
Abita Springs Police Department Sergeant Scott Meyer also testified. On June 23, 1995, at approximately noon, he was working an accident on Highway 36 near the red light in Abita when he heard a gunshot. He "ducked," but then continued to write-up the accident. Approximately forty-five seconds later, one of the persons involved in the accident advised Sergeant Meyer that a vehicle had stopped behind him and that its driver was trying to attract his attention. Sergeant Meyer turned and saw that the vehicle was a white van. The white van drove off followed by a small red car. Sergeant Meyer did not see the occupants of either vehicle. Approximately thirty seconds to a minute later, Sergeant Meyer was advised by radio of a shooting on Highway 36. Sergeant Meyer went to the scene of the shooting, which was approximately half-amile from his then location. He spoke to Robbie Anthony, a witness to the incident, and transported him to the sheriffs office upon learning that he had information concerning the shooting.
Reverend L. Stephen Holzhalb testified that on June 23, 1995, he and his wife were driving from Covington to Abita when a white van pulled in front of them as if to make a left turn. A person, which to the best of Reverend Holzhalb's recollection was an African-American man, exited the van and moved towards a small red car behind the van. The Reverend did not see any of the occupants of the car. He then heard three or four gunshots, and while his wife telephoned police, he put his vehicle in reverse, backed into a driveway, and left the scene.
St. Tammany Parish Sheriff's Office Deputy Barney Tyrney testified that he responded to the shooting on Highway 36 on June 23, 1995, at approximately noon. He found a white Ford van blocking both lanes of travel on Highway 36 and a black male lying shot approximately 20 or thirty feet from the van. He secured the scene and spoke to Martha Burghardt, who reported that the perpetrator had been a black male. He was also notified of another witness, Robbie Anthony, who had reported that someone in a red car had shot at the white van.
Deputy Tyrney saw Michael Wright at the scene approximately eight to ten minutes after he arrived and approximately ten to twelve minutes after the shooting. According to Deputy Tyrney, Wright was accompanied by his brother, Eric, and he (Wright) was "extremely upset and irate." He kept yelling, "You don't understand. He whipped my sister's ass this morning. You don't understand." Deputy Tyrney indicated that Wright calmed down after being threatened with arrest.
Deputy Tyrney saw Burns when he went back to the police station. She had minor swelling to one of her eyes and minor irritation to her lip. Deputy Tyrney identified State Exhibits 12-15 as photographs fairly and accurately depicting Burns' face as it appeared when he observed her. Those photographs corroborate Deputy Tyrney's observations.
Covington Police Department Detective Melvin Crockett testified that on June 23, 1995, at approximately noon, he was dispatched to the hospital to discover the identity of the victim of the offense. Subsequently, he went to the St. Tammany Parish Sheriff's office after receiving a radio message that the person involved in the shooting was at that location. When he exited his vehicle at the Sheriffs office, he saw Michael Wright and his brother, Eric, sitting in a vehicle. Detective Crockett had known Wright since childhood. Wright got out of the vehicle and stated, "Magic, tell my sister, Helen, to come on out of there."[3] When asked about Wright's demeanor as he made the statement, Detective Crockett answered, *491 "He was pissed off for some unknown reason." Detective Crockett went into the detective division, found Burns and her mother, and told them that Wright "wanted them outside." Detective Crockett identified State Exhibits 12-15 as photographs accurately depicting Burns' appearance on June 23, 1995.
Detective Crockett also testified that he was present during Burns' interview. He identified State Exhibit 16 as the statement/waiver of Miranda rights form given to Burns by Detective Hall and signed by Burns at the beginning of the interview. He also identified State Exhibit 17 as the statement/waiver of Miranda rights form given to Burns by Detective Hall and signed by Burns at the beginning of her taped statement.
Jefferson Parish Coroner's Office Forensic Pathologist Fraser Mackenzie testified regarding the autopsy he performed on the victim. He indicated the cause of death was two gunshot wounds that perforated the victim's heart, liver and kidney.
St. Tammany Parish Sheriffs Office Sergeant Otto Stubbs testified about his role in the investigation. He indicated he had ten years experience in "firearms identification," which he defined as determining whether a certain bullet was fired from, or whether a certain cartridge case was fired by, a particular weapon. He identified State Exhibit 32 as the model 15 Smith and Wesson .38 caliber revolver which Detective Blackwell submitted to him with five fired cartridge cases. He also identified State Exhibit 34 as the two fired .38 caliber bullets Dr. Mackenzie removed from the victim's body in his presence. Sergeant Stubbs' tests revealed that the two bullets were fired by the .38 caliber revolver. Sergeant Stubbs also identified State Exhibits 35 and 36 as photographs of Burns that he had taken on the day of the offense. He testified that the photographs showed cuts to Burns' upper and lower lips. Those photographs corroborate Sergeant Stubbs' observations.
Lisa Armstrong Holmes testified that on the day in question, she was working at the Covington branch of Enterprise Car Rental. She identified State Exhibit 37 as a rental agreement between Enterprise Car Rental and Burns renting a red Metro on June 23 at 10:05 a.m. for one day to be driven in-state. She described the person who rented the vehicle as a black lady with short hair. She noticed nothing unusual about her and noticed no unusual markings on her. She testified that a driver's license was required of anyone wishing to rent a vehicle, and that the person identified as Helen Burns had presented her with a driver's license on this occasion. The vehicle was returned on June 24 at 11:50 a.m. by two men. Ms. Holmes thought this strange because the men were not authorized to drive the vehicle.
Robert Rowe testified that on June 23, 1995, at approximately noon, he was on Highway 36 coming back from lunch. He was stopped by a woman travelling the opposite direction, who told him that a man was lying face down in the street. Mr. Rowe went to the scene to see if he could help. He saw the victim lying face-down on the ground behind a white van which was parked in the middle of the highway at an angle. He did not see Michael Wright at the scene when he arrived, but did see him later after the police and the EMTs arrived. At that time, Wright was wearing a white shirt, but Rowe could not remember whether it was a T-shirt or a tank top.
St. Tammany Parish Sheriffs Office Detective James Davis testified that he responded to the scene of the shooting on June 23, 1995, at approximately noon. He recognized Eric Wright at the scene. He described Eric Wright as a 6' black male with dreadlocks. Eric Wright was with a black male who was 5'11" to 6', with a short haircut and a medium to dark complexion. The man with Eric Wright was hostile at the crime scene, but Eric Wright was calm. Detective Davis also testified that the murder weapon was not found at the scene.
St. Tammany Parish Sheriff's Office Detective James Blackwell testified that on June 23, 1995, he was a member of the criminal patrol division. On that date, he went to the Covington Police Department and recovered a weapon from Hattie Wright, Michael Wright's mother. He immediately placed *492 the weapon into an evidence bag, and eventually turned the weapon over to Sergeant Stubbs. Detective Blackwell identified State Exhibit 32 as the weapon that Mrs. Wright surrendered to him.
In an effort to establish Burns' motive, the State presented the testimony of Robert L. Bailey, III, attorney-at-law. On May 12, 1995, Mr. Bailey finalized drafting the victim's will. He testified that the victim did not approve the initial draft of his will, explaining that it had not been acceptable to his wife, and made changes to leave his wife more under the will. Mr. Bailey found it unusual that the victim's wife never appeared to have her will drafted because in his experience young married couples usually appeared and made wills together. Mr. Bailey identified State Exhibit 38 as the final will of the victim.
St. Tammany Parish Sheriffs Office Detective David Hall testified that Burns surrendered herself to him on June 23, 1995, at the jail facility of the sheriffs complex. At that time, Burns had redness around her right eye, a blood bruise within the eye itself, and injuries inside and outside of her lips. In response to questioning, Detective Hall indicated that Burns did not complain of any injuries to her arms or her fingers, and that he did not see any swelling or bruising to either her fingers, her legs, or her torso. Detective Hall identified State Exhibit 16 as the statement/waiver of Miranda rights form given to and signed by Burns after he met her. He read the form to Burns and she claimed to understand her rights. Burns made an initial statement which was not recorded. Thereafter, Detective Hall asked Burns whether she would give a recorded statement and she voiced no objection. Detective Hall then recorded Burns' statement, again advising her of her Miranda rights at the beginning of the recording.
Detective Hall identified State Exhibit 10[4] as the statement/waiver of Miranda rights form that Burns signed at the beginning of the recording. He identified State Exhibit 39 as a Panasonic tape containing Burns' taped statement. He identified State Exhibit 40 as an accurate transcript of the statement. Over the objection of counsel for Burns, the taped statement was played for the jury.
In the taped statement, Burns confessed to shooting her husband. Her version of the events surrounding the shooting was as follows. On the morning of the offense she woke up her child and began giving her a bath. The child cried because she did not want to be awakened so early. The victim began cursing Burns concerning the child being in the bathtub and crying. Burns told the victim that she was getting ready to get the child out of the bathtub after she finished the child's bath. The victim immediately reached over Burns and lifted the child out of the bathtub and told Burns to get the child a towel and dry her off. Burns told the victim that he had taken the child out of the bathtub, so he should get a towel and dry the child off. The victim struck Burns in the face. Burns told the child to go in the bedroom, put her panties on, and wait. The victim began to beat Burns. Burns escaped down the hall, but the victim pushed her against the wall and punched her in the face. Burns fought with the victim, stopped to pick up the child, and attempted to get her keys, but the victim grabbed her hand and tried to break her fingers by pulling them back. The victim took away Burns' keys, but Burns had a spare set of car keys in her shoe. The victim continued to beat Burns and she continued to fight to get away. As Burns was making her way through the front room, the victim struck her and she fell on the sofa. The victim punched her while she was on the floor, striking her in her face, her head, her stomach, and "everywhere his fist [could] go."
The victim struck her again as she grabbed for the door. The victim dragged Burns down the steps and into the grass, constantly hitting, kicking, and punching her. Burns heard her neighbor's door across the street close and assumed that the victim also heard this because he stopped beating her *493 after calling her some names and kicking her. Burns went to her vehicle. She did not feel dressed because she was only wearing shorts, a shirt, and tennis shoes. She did not go back for the child because she "couldn't go back in there." She warmed up her car, a white Chrysler Newport, drove down the dirt road, parked, and cried. She wanted to telephone her boss, but felt unable to do so because her face was "messed up." She drove around for a while and decided to change clothes because her clothes were hot, sweaty, and bloody. Due to the time, Burns suspected that the victim had probably gone to work and so she returned to the home.
When she did not see her van at her home, she felt that it was safe to enter the home. However, she did not have her keys, so she broke a window to gain entry into the home. She changed clothes. She tried to think of somewhere to go take a bath, before beginning to look for sunglasses to cover her face. She rode around, got a cup of ice for her lip, and then waited across the street from where the victim worked.
After she saw the victim pass on his way home for lunch, she began following him. He was driving a white 1993 Aerostar van. The victim noticed Burns and sped up. Eventually, the victim slammed on his brakes in the middle of the road and jumped out of the van. Burns tried to put her vehicle into park, roll up her window, and get out of her vehicle, but the victim approached and reached through her open window. Burns tried to get out of the vehicle, and managed to get a leg out, but the victim pushed the door towards her leg. Burns reached over to a seat and retrieved a gun. She held the gun so that it was visible to the victim, but he did not retreat. She then reached out the window and fired the gun, but the victim kept coming. She then shot the victim, but he still kept coming. She shot the victim again and he fell to the ground. She left in her vehicle, went to her mother's house, and told her mother what had happened. She showed her mother the gun and told her that she (Burns) was going to the police station. Her mother went with her to the police station.
In response to Detective Hall's questioning, Burns added the following to her account. She indicated that when she went back to her house, her child was not there. She retrieved the gun, which belonged to the victim, when she went back to the house. She then loaded the weapon. According to Burns, she fired the weapon "maybe two or three times," but did not know how many times she hit the victim. After the victim fell to the ground, he threatened to kill her. When asked about the clothes she was wearing when she was beaten, she indicated that she left a green shirt and a white towel, which she had used to wipe her mouth, in her vehicle.
Detective Hall asked Burns whether she had picked up the gun when she went back to the house because she intended to find her husband and shoot him, and she answered, "I intended on hurting him like he hurted [sic] me." When Detective Hall asked Burns whether she intended to hurt the victim when she parked across from where he worked, she answered, "I intended to hurt him like he hurt me."
Detective Hall testified that Burns' mother never produced the clothing that Burns had alleged was in her vehicle, claiming that she (Burns' mother) was unable to find the clothing. Additionally, he identified State Exhibits 12 - 15 and 35 and 36 as photographs accurately depicting Burns' condition when he encountered her. He also testified that he spoke to the owner and two employees of Cross Incorporated, the victim's place of employment, and verified that the victim had worked there and had been at work on the day of the offense. He also learned that some individuals from Burns' family had come to talk to the victim at his place of employment prior to the shooting on the day of the offense.
Beverly Sylve, the victim's mother, testified that she last saw the victim alive on the Sunday before his death, which was Father's Day. The victim did not mention anything about planning to go to Florida with Burns. Ms. Sylve testified that if the victim would have had such plans, he would have mentioned them to her. This testimony, coupled with testimony that Burns and the victim owned a van, casts suspicion on testimony *494 that the small red rental car was leased for a vacation trip to Florida.
Certain defense witnesses also provided testimony pertinent to the State's case against Wright and Burns. Retired school teacher Christella Flot testified. She had been Michael Wright's sixth grade teacher and had known him for 25-30 years. On June 23, 1995, she was in the vicinity of Highway 36 when she heard an ambulance. She followed the ambulance to the crime scene. When she arrived at the scene, she saw a body lying on the highway. A few minutes later, she saw Wright drive up with his brother, Eric, in a gold colored vehicle. Ms. Flot spoke to Wright and he did not act any differently than on other occasions when she had spoken with him.
Marnisha Sandifer testified that on June 23, 1995, at approximately noon, she was in the vicinity of Highway 36. When she arrived at the crime scene, an ambulance was already there. Approximately five minutes after she arrived, she saw Michael Wright pull-up in a gold colored vehicle with his brother. He was wearing blue jeans, a hat, and a short sleeved shirt. On cross-examination by the State, Ms. Sandifer revealed that her roommate was Wright's girlfriend.
Hattie Wright testified that on the morning of June 23, 1995, she was at home with her two sons, Michael and Eric. She expected to see her daughter, Helen Burns, later in the morning because Burns customarily brought her baby to Mrs. Wright so that Burns could work. When Burns did not arrive with the baby as expected, Mrs. Wright persuaded Michael to drive her to Burns' home. Mrs. Wright explained that she was diabetic and had been feeling weak that particular morning.
When Mrs. Wright and Michael arrived at Burns' home, Burns was not there, but her child was walking in the front room. The victim was in the bathroom. He appeared "mad" and did not want to come out of the bathroom. Mrs. Wright asked where Burns was, and the victim answered, "Oh, she's gone." Mrs. Wright told the victim that she was "going to take the baby," and he responded, "Okay."
After Mrs. Wright and Michael returned home, she received a telephone call from the victim's cousin, Cheryl McGee. Ms. McGee told Mrs. Wright, "Ms. Hattie, it's unusual for Helenwe can't find her. She usually come to work, you know, because today is payday. Ms. Hattie, if I was you, I would try to find Helen." Mrs. Wright decided to ask the victim "if [Burns] was throwed [sic] in a ditch or [if] he had her hid somewhere." Mrs. Wright, the child, and Michael then drove to the victim's place of employment to speak to him. When Mrs. Wright asked the victim where Burns was, he answered, "No, ma'am, I ain't throwed her in no ditch. I don't know where she at [sic]." After the victim played with the child and kissed her, Mrs. Wright, the child, and Michael returned home.
At approximately lunchtime, Burns appeared at her mother's home with a gun in her hand. Mrs. Wright asked Burns, "Girl, what's wrong with you?" Upon hearing this, Michael jumped up, and Eric came out of his room. Burns responded, "I just shot my husband, Conway." When Burns was asked where she had shot the victim, she answered, "in Abita." According to Mrs. Wright, her daughter was "beaten up in the face and everything." Mrs. Wright drove her daughter to the Covington Police Department. Michael and Eric left with the baby to check on the victim. Mrs. Wright told Eric to take the baby to someone "to keep for [her]." Mrs. Wright indicated that she did not take the weapon with her when she went to the police department, but told the police of its presence at her home. Subsequently, upon request of the police, she retrieved the weapon and brought it to the police department.
Mrs. Wright testified that she knew of no animosity, bad feeling, or bad blood existing between the victim and Michael; that Michael never said that he was going to get the victim for doing "this" to his sister; and that Michael "didn't really know nothing about Helen and Conway having fights and stuff." When asked what kind of car her daughter had, Mrs. Wright answered, "She had a brown Dodge I think it was. A light car. The kind she have now." Subsequently, Mrs. Wright conceded that her daughter's *495 car was at Enterprise Leasing at the time in question, and that she (Burns) had been driving a red rental car at that time. Mrs. Wright claimed that her daughter had told her that she (Burns) had the car because "[t]hey was going to go on vacation."
On cross-examination, the State accused Mrs. Wright of "concocting" the story about going to her daughter's home to explain away the fact that her daughter came by her home and conspired with Michael to kill the victim. Mrs. Wright denied the State's accusations. She conceded, however, that she had not mentioned the telephone call from Cheryl McGee when she testified before the grand jury, but explained that she had informed counsel for the State of the call at his office. She also conceded that she testified before the grand jury that when she initially questioned the victim concerning her daughter's whereabouts, he stated that he had just beaten her.
Eric Wright also testified. On the morning of June 23, 1995, he was at his mother's house where he lived. His brother Michael also lived in the home. Eric awoke between 6:00 a.m. and 7:00 a.m. after hearing his brother loudly protesting having to wake up and drive his mother to Abita "to see about Helen." His mother and brother returned with his sister's child.
Later that morning, Eric was told that his mother and brother were going to the victim's place of employment. According to Eric, his brother came back from the victim's place of employment upset. When asked what his brother was upset about, Eric answered: "He had heard that Helen had got beaten up and then he didn't want to get up that morning, my mom wanted him to get up and go with her and he just didn't want to get up. So he was just upset."
Eric saw his sister at approximately noon when she came to the house "with a hat on and some shades and a gun in her hand." Mrs. Wright calmed Burns down and took her to the police. Eric and Michael took the baby to their cousin's home. After dropping the child off, Eric and Michael went to Abita to see what had occurred. They traveled in Eric's gold colored Acura Legend automobile. They knew where to go because they had overheard their sister's conversation with their mother. Eric acknowledged that Michael was outraged and yelling when they got to the scene, but explained that this was because of their sister getting beaten up. When asked whether his brother could have been gone from the house for an extended period without his (Eric's) knowledge, he answered, "No." However, he did concede that he was in his room asleep when his mother and Michael brought the child home, and thus, he did not know whether Michael drove off again.
On cross-examination, Eric guessed that his mother and Michael were gone for about half-an-hour. He conceded that he had seen his sister's red rental car on the day of the offense, but denied taking it to Enterprise with Michael. In response to questioning on re-direct examination, Eric stated that although Michael was upset at the scene, he was not "in a fighting rage."
Earl Penn testified that he saw Michael Wright on June 23, 1995, in his (Wright's) yard between approximately 10:30 a.m. and 11:00 a.m. Mr. Penn spoke with Wright for approximately ten minutes concerning Wright's work in the yard. Wright was not upset, yelling, screaming, or in a rage. Mr. Penn also remembered seeing Wright's mother when she came out to speak to Wright briefly. Mr. Penn conceded that he was Wright's good friend, but added that he had also been the victim's good friend.
Joseph Nathaniel Davidson testified that on the date in question, the victim passed by him driving a white van. After Mr. Davidson made a turn and traveled approximately a half block, he heard gunshots and ran to the corner. He saw a man getting into a red car and "taking off." He could not determine the race of the man. He did not know whether or not the man who jumped into the red car was Wright. He also did not know whether or not anyone else was in the vehicle. When asked if the "man" could have been a female in male clothing, Mr. Davidson responded, "If it was a female in man [sic] clothing, she had no humps or bumps nowhere on, you know what I am saying."
*496 Gary Andrews also testified. On June 23, 1995, he was working nights and would have arrived home from work between 6:30 a.m. and 7:00 a.m. He lived across the street from Burns and the victim. When he was getting out of his vehicle in his yard after coming back from work on June 23, 1995, he heard a noise across the street. He described the noise as sounding like something being hit or dropped. He looked, but saw nothing. He went into his home and closed the door. However, he then heard another noise, looked out, and this time saw the victim's trailer door open. He walked to the back of his vehicle and saw the victim standing over Burns telling her something. Burns got up and walked to her "big white car" with her head down. Her face appeared swollen. The victim went back into his home, and Mr. Andrews went back into his home. When Mr. Andrews next looked out, Burns' vehicle had gone. Mr. Andrews did not see a red Geo Metro vehicle at Burns' home. He conceded that he was a distant cousin of the Wright family.
Derrick Arnez Sams testified that he worked with the victim at Cross Incorporated, a pallet company located approximately five to six miles from Highway 36. On June 23, 1995, he remembered Michael Wright, an older lady, and an infant coming to visit the victim at approximately 12:00 p.m. The victim spoke with the Wrights for five to ten minutes. Mr. Sams could not tell if any of the conversation was "heated." The victim left after the Wrights left.
After a thorough review of the record, we are convinced the evidence presented herein, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of the offense of second degree murder and Wright's identity as a perpetrator of the offense. It is clear that on the date of the shooting, Burns rented a red Metro. On that same day, two people were seen in a small red car following the victim in his van. Witnesses testified that one of the occupants of the red car deliberately aimed a pistol at the victim and fired shots, which resulted in the victim's death. Furthermore, Wright was positively identified as the perpetrator by Mr. Sloan, who had known Wright since childhood. Accordingly, this assignment of error is without merit.

ADVICE OF PRESCRIPTIVE PERIOD FOR POST-CONVICTION RELIEF
In assignment of error number two, Wright contends the trial judge failed to properly advise him of the prescriptive period for filing for post-conviction relief. The State concedes that the defendant was misinformed of the period.
The record reflects that after imposing sentence, the trial court advised the defendant of the prescriptive period for filing for post-conviction relief as follows: "he has three years from this date to file any petition for post conviction relief under Code of Criminal Procedure Article 930.8."
Louisiana Code of Criminal Procedure article 930.8(A), in pertinent part, provides that no post conviction relief application will be considered "if it is filed more than three years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922." However, the trial court's failure to properly advise the defendant of the delay as required by article 930.8(C) has no bearing on the sentence and is not grounds to reverse the sentence or remand the case for resentencing. See State v. Lewis, 94-2145, p. 8 (La.App. 1 Cir. 11/9/95), 665 So.2d 38, 43. The trial court is directed to give the defendant written notice of the prescriptive period for applying for post-conviction relief within ten days of the rendition of this opinion and to file written proof in the record of the proceedings that the defendant has received notice.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Helen Burns has a separate appeal pending before this Court arising from her conviction for this offense. See State v. Burns, 98 KA 0602 (La.App. 1 Cir. 2/19/99), ___ So.2d ___, also rendered this date.
[2] Prior to the amendment by 1995 La.Acts No. 1300, § 1, LSA-C.E. art. 801(D)(1)(c) provided as follows:

D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
. . . .
(c) One of identification of a person made after perceiving him, and which confirms the testimony of the declarant that he had made an identification, except that in cases of amnesia resulting from physical injury from the criminal act, any other person may testify to an out of court identification.
[3] Although not specifically indicated in the record, it is apparent that Wright directed this comment to Detective Crockett.
[4] The State apparently misspoke in identifying this exhibit as State Exhibit 10, rather than State Exhibit 17. Detective Hall's testimony makes clear that State Exhibit 17, rather than State Exhibit 10, was actually presented to him for identification.