McClendon, j.
[2The defendant, Cardale Green, was charged by grand jury indictment with second degree murder of Derrick Casey, a violation of Louisiana Revised Statutes 14:30.1 (count one) and attempted second degree murder of Kenneth Cobbs, a violation of Louisiana Revised Statutes 14:30.1 and 14:27 (count two).[1] He entered a plea of not guilty and, following a jury trial, was found guilty as charged on both counts. He filed motions for postverdict judgment of acquittal and new trial, both of which were denied. The defendant was then sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on count one, and to thirty years at hard labor without the benefit of parole, probation, or suspension of sentence on count two. The sentences were ordered to run consecutively. He now appeals, alleging two counseled and two pro se assignments of error. For the following reasons, we reverse the defendant’s convictions, vacate the defendant’s sentences, and remand for a new trial.
FACTS
On January 13, 2011, Baton Rouge Police Department Sergeant Kevin Adcock was dispatched to 1841 Gracie Street in the Spanish Town neighborhood in Baton Rouge where he found one victim, Derrick Casey, lying dead on a couch in the living room near the front door of the house. Sergeant Adcock took photographs and collected evidence from the crime scene, including one Winchester nine millimeter shell casing located inside the living room, five Winchester nine millimeter shell casings, one PMC nine millimeter live round, and one Winchester nine millimeter live round, all found on the roadway outside of the residence. Also recovered were a projectile found inside of the couch and a cellular telephone located in the backyard of the house. The cellular telephone was registered to the defendant. Detectives subpoenaed the records from that phone and developed Mark Young as an additional suspect. Call records of Young’s cellular telephone were also subpoenaed.
laThe investigation led to a witness, Shermon Mealey, and to a second victim, Kenneth “Troy” Cobbs. According to Mea-ley’s trial testimony, on the day of the incident, he, Cobbs, Casey, and Martin Rogers were “riding around, having fun.” Mealey decided to purchase two Lortab pills, so he contacted the defendant and met him on Hurst Street. The defendant got onto the hood of Meale/s car and instructed Mealey to drive around the corner to Gracie Street Palm prints left on the hood of the vehicle matched the left palm of the defendant.
When they arrived at 1841 Gracie Street, Mealey could not enter the house due to paralysis of his legs, so Casey entered the house. Mealey saw the defendant *686 walk toward the house, but was unsure whether he entered. Mealey was also uncertain whether Cobbs entered the house. After hearing gunshots, Mealey saw Cobbs running. Cobbs then got into Mealey’s vehicle. Mealey drove away with Cobbs and Rogers and called 911 to report the shooting. As they drove away, there were additional shots fired from the backyard of the Gracie Street house.
Cobbs, who received a gunshot wound to his hip during the incident, testified that on the day of the incident, Mealey received a telephone call and thereafter stated that he needed to “handle some business.” Cobbs and Mealey then drove to Spanish Town with Casey and Rogers. At some point, Mealey called someone for directions. When they arrived at Spanish Town Road, Mealey picked up someone who instructed Mealey to drive around the corner. However, Mealey told that individual to get on the hood of his vehicle and direct them to the location. The person did so, and they arrived at 1841 Gracie Street. Mealey gave Casey money and asked Casey to “take care of some business” for him. Casey took the money and entered the house. Cobbs exited the vehicle, stood near it, and talked to Mealey. Cobbs decided Casey was taking too long and proceeded to walk toward the house. As he did so, he heard gunfire. Cobbs began running away and realized that he had been shot in his hip. He got back into the vehicle with Mealey, and as they drove away, someone exited the front of the house, shot at them, and jumped the gate. Cobbs testified that he saw two people in the backyard of the Gracie Street house. Cobbs explained that he knew who he saw | ¿running out of the house, but he did not know who shot him because his back was turned away from the shooter. According to Cobbs, the person that he saw running out of the house was not the defendant.
A records custodian from Verizon Wireless testified at trial. According to the defendant’s cellular telephone records, he spoke with Mealey multiple times on the date of the murder, but starting at 5:55 p.m., all of the calls to the defendant’s telephone were sent to voicemail. The last call from the defendant’s phone was to Young and was placed at 5:41 p.m.
A Taurus .480 revolver was located in a couch at 1332 Wellington Drive, Young’s residence. The projectile located inside of the couch at 1841 Grade Street was determined to have been fired from the Taurus. The two bullets recovered from Casey’s body during his autopsy were not fired from the Taurus.[2] According to the firearms expert who testified at trial, those two bullets were much smaller and a different caliber than that located inside of the couch. The expert was unable to determine whether the two bullets recovered during the autopsy were fired from the same weapon, but he did state that they were of the same caliber and consistent with having been fired from a revolver.
The defendant did not testify at trial, but his video and audio recorded statement were played for the jury. He initially stated that he was in the Spanish Town area with his family on the day of the incident. He later stated that he was there “hanging out” at P.I.’s house, which was located at 1841 Gracie Street, with Young. He stated that he went to P.I.’s house around lunchtime and left approximately two hours later. According to the defendant, he found out about the murder from his mother, who called him on his cellular telephone. He then stated his mother actually called him on his girlfriend’s cellular telephone *687 because his cellular telephone was lost. The defendant explained that he lost his phone on the day of the murder at P.I.’s house while he was playing with dogs in the backyard. He denied getting on the hood of the car and denied any involvement in the murder.
|COUNSELED ASSIGNMENT OF ERROR NUMBER ONE
In cases such as this one, where the defendant raises issues on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should preliminarily determine the sufficiency of the evidence, before discussing the other issues raised on appeal. When the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must review the assignments of error to determine whether the accused is entitled to a new trial. State v. Hearold, 603 So.2d 731, 734 (La. 1992); State v. Smith, 03-0917 (La.App. 1 Cir. 12/31/03), 868 So.2d 794, 798. Accordingly, we will first address the defendant’s first counseled assignment of error, which challenges the sufficiency of the State’s evidence.
In his first counseled assignment of error, the defendant argues that the evidence presented by the State was insufficient to prove all of the elements of both offenses beyond a reasonable doubt. Specifically, the defendant contends that although there was evidence that he was present at the scene of the murder, there was no evidence that he shot Casey, wounded Cobbs, or had the specific intent to kill or do great bodily harm to either victim.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821B. In conducting this review, we also must be expressly mindful of Louisiana’s circumstantial evidence test, which states, in part, “assuming every fact to be proved that the evidence tends to prove, in order to convict,” every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438; State v. Wright, 98-0601 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157, 00-0895 (La. 11/17/00), 773 So.2d 732.
|fiWhen a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Wright, 730 So.2d at 487.
The crime of second degree murder, in pertinent part, “is the killing of a human being: (1) [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]” LSA-R.S. 14:30.1A(1). Specific criminal intent is that “state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” LSA-R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven *688 by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant’s actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625 (La.App. 1 Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So.2d 923. To be guilty of attempted second degree murder, a defendant must have the specific intent to kill and not merely the specific intent to inflict great bodily harm. State v. Maten, 04-1718 (La.App. 1 Cir. 3/24/05), 899 So.2d 711, 716, writ denied, 05-1570 (La. 1/27/06), 922 So.2d 544. Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun. See State v. Brunet, 95-0340 (La. App. 1 Cir. 4/30/96), 674 So.2d 344, 349, writ denied, 96-1406 (La. 11/1/96), 681 So.2d 1258. It has long been recognized that specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. State v. Hoffman, 98-3118 (La. 4/11/00), 768 So.2d 542, 585, opinion supplemented by, 00-1609 (La. 6/14/00), 768 So.2d 592 (per curiam), cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
17When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credi-bilities of the witnesses, and this Court will generally not second-guess those determinations. State v. Hughes, 05-0992 (La. 11/29/06), 943 So.2d 1047, 1051; State v. Davis, 01-3033 (La.App. 1 Cir. 6/21/02), 822 So.2d 161, 163-64.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LSA-R.S. 14:24. However, the defendant’s mere presence at the scene is not enough to “concern” him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be “concerned” in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. State v. Neal, 00-0674 (La. 6/29/01), 796 So.2d 649, 659, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). However, “[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.” State v. Anderson, 97-1301 (La. 2/6/98), 707 So.2d 1223, 1225 (per curiam).
A thorough review of the record indicates that any rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and attempted second degree murder, and the defendant’s identity as the perpetrator of those offenses. The verdicts rendered in this case indicate that the jury credited the testimony of the witnesses against the defendant. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is [ 8conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its suffi *689 ciency. State v. Lofton, 96-1429 (La.App. 1 Cir. 3/27/97), 691 So.2d 1365, 1368, writ denied, 97-1124 (La. 10/17/97), 701 So.2d 1331. The credibility of witnesses will not be reweighed on appeal. State v. James, 02-2079 (La.App. 1 Cir. 5/9/03), 849 So.2d 574, 581.
The verdicts rendered in this case further indicate the jury rejected defendant’s hypothesis of innocence that he was no longer at 1841 Gracie Street at the time of the shooting. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. See State v. Moten, 510 So.2d 55, 61 (La.App. 1 Cir.), writ denied, 514 So.2d 126 (La. 1987). No such hypothesis exists in this case. Further, in reviewing the evidence, we cannot say that the jury’s determination was irrational under the facts and circumstances presented to them. See State v. Ordodi, 06-0207 (La. 11/29/06), 946 So.2d 654, 662.
The jury reviewed the defendant’s audio and video recorded statement wherein he denied riding on the hood of Mealey’s vehicle and being present at 1841 Gracie Street at the time of the incident. He initially stated that he lost his phone while walking to Gracie Street, but later, when law enforcement told him that his phone was recovered at the house, he stated that it fell out while he was playing with dogs at the Gracie Street house on the day of the incident. The defendant claimed that he left the house at approximately 2:00 p.m. to 3:00 p.m. However, the records from his cellular telephone established that he was in control of it at least until 5:55 p.m. on the day of the murder, when calls began being forwarded to voicemail. The defendant’s last phone conversation with Mealey was at 5:26 p.m., and Mealey reported the shooting shortly thereafter at 6:15 p.m. Mealey identified the defendant as the person who he picked up on Hurst Street and who rode on the hood of his car to Gracie Street. The prints left on the hood of the vehicle matched the defendant’s left palm print. Cobbs |9could not identify who shot him, but 'testified that two shooters exited the house. Ballistics evidence indicated that at least two weapons Were used during the crime. ■ One of those weapons, a Taurus .480 revolver, was located in Young’s home and determined to have fired the bullet found lodged inside of the couch in the Gracie Street house. The bullets recovered from Casey’s body during the autopsy were of a different caliber and could not have been fired from that revolver. Smaller caliber shell casings were located on the living room floor as well as on the roadway in front of the Gracie Street house.
An appellate court errs by substituting its appreciation.of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 07-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Based on the foregoing reasons, this assignment of error lacks merit.
PRO SE ASSIGNMENT OF ERROR NUMBER ONE
In his first pro se assignment of error, the defendant contends that he was denied his right to counsel of choice, in violation of the .Sixth and Fourteenth Amendments to the United States Constitution, when the district court allowed the withdrawal of “two qualified attorneys.”
At the defendant’s arraignment on June 9, 2011, a public defender was appointed. The public defender’s office subsequently withdrew, citing a conflict with its repre *690 sentation of co-defendant Young. A conflict counselor from the public defender’s office, David Rozas, enrolled to represent the defendant in July 2011. After two defense motions and one joint motion to continue, trial was set for March 5, 2012. That day, defense counsel filed a motion to continue, and the trial date was continued until June 25, 2012. On June 25, 2012, a motion to sever was granted allowing the defendant and Young to be tried separately, and the matter was continued to September 24, 2012. On September 20, 2012, the matter was continued for trial until February 19, 2013, and the September 24, 2012 trial date was cancelled. On February 19, 2013, Rozas was relieved of representation of the defendant, and Carson Marcantel |inwas appointed. On defense counsel’s motion, the matter was continued until July 15, 2013. On June 13, 2013, Marcantel moved to withdraw, and the defendant noted that he was “hiring” new counsel. The defense filed a motion to continue a status conference until July 10, 2013, but the July 15, 2013 trial date was maintained.
On July 10, 2013, Joel Porter was present in court on a motion to enroll as counsel, which was filed jointly with Tiffany Foxworth. The district court canceled the July 15, 2013 trial date and requested that both sides submit memoranda pertaining to the ability of these two defense attorneys to enroll as counsel of record. In the State’s memorandum, it noted that the defendant and co-defendant Young were appointed separate counsel at arraignment, and the defendant filed a motion to sever, which was granted. A jury subsequently acquitted Young, who was represented by Porter and Foxworth. After Young’s acquittal, Foxworth and Porter filed a' motion to enroll as the defendant’s attorneys of record. The parties then returned to court for a hearing on the motion. At the hearing, Porter argued that he did not believe there were antagonistic defenses or conflicts because Young’s case was not being tried simultaneously with the defendant’s and because Young had been acquitted. Porter noted that the defendant executed an affidavit waiving any “actual [or] perceived conflict.” The State responded that it would also need a waiver by Young. However, the State concluded that its position was that even with the two waivers, the enrollment would be in violation of the Rules of Professional Conduct. At the conclusion of the hearing, the district court granted the motion to enroll. On motion of defense counsel, the matter was continued for a status conference on August 15, 2013. The State filed a writ application with this Court seeking review of the district court’s ruling, and this Court denied the writ application. See State v. Green, 2013-1286 (La.App. 1 Cir. 9/9/13), 2013 WL 12120922 (unpublished writ action). The State also sought review with the Louisiana Supreme Court, which also denied the application. See State v. Green, 2013-2278 (La. 11/15/13), 125 So.3d 1112.
However, on July 29, 2013, prior to the rulings of this Court and the supreme court, the State filed complaints with the Louisiana Attorney Disciplinary Board against |T1 Foxworth and Porter. After receipt of letters advising them of the investigation, Foxworth and Porter moved to withdraw as counsel of record for the defendant. After the Louisiana Supreme Court denied writs on the district court’s ruling that no conflict existed, the parties appeared for a hearing on the motion to withdraw on November 21, 2013. At the hearing, the district court specifically asked defense counsel if they were continuing to urge their motion to withdraw to which defense counsel responded affirmatively. The defendant objected to the withdrawal of his attorneys. The district court then noted that both the State and the defense attorneys joined in the motion and *691 granted the motion over the defendant’s objection. On motion of defense counsel, the court ordered that the matter be continued until April 29, 2014, and cancelled the March 24, 2014 trial date.[3]
Immediately after the district court’s ruling granting the motion to withdraw, Porter orally requested the district court to reconsider its ruling. Porter explained that the motion had been filed out of an abundance of caution and that he and Fox-worth did not believe that there was a conflict of interest, “adversary” of defenses, or concurrent representation. He noted that the case was three months away from trial and that “the courts have ruled that there is not a conflict and that [he and Foxworth] can represent” the defendant. He stated that he was “stunned and shocked” that the district court had granted the motion to withdraw. He went on to state:
... when the motion was filed, Your Honor, it was filed months ago in relationship [sic] to a complaint that was filed by [the State], okay. A complaint that had no basis, that was groundless, and was really frivolous, okay. We filed it just to protect ourselves with the bar association. But now, since the court— all the way up to the supreme court— Louisiana Supreme Court—ruled that we can represent this man, it has always been my intent from day one to represent him. To vigorously represent him. I don’t care whether it is in front of a bench trial or in front of 12 little green men from Mars, okay. They don’t have the facts, they can’t win this case, not in this court or any other court in this United States. So we want to reurge— we do not want to be off this case.
Following counsel’s response, the State noted that defense counsel, prior to the district court’s ruling granting the motion to withdraw, specifically informed the court that they were still urging their motion. The court stated that it would “not revisit [its] 1 ^decision” and that the “matter [was] closed, as far as [it was] concerned.” The court noted that Porter was relieved from representation. Porter then indicated that he wanted to file a writ, but it does not appear that he did so.
Porter, along with Foxworth and Elton Heron, subsequently filed a written motion to “re-enroll” on December 3, 2013. At the December 5, 2013 hearing on the motion, the district court denied the motion to re-enroll and maintained the matter for further proceedings on April 29, 2014. Porter filed a writ application with this Court, which was not considered due to rule violations. See State v. Green, 14-0009 (La. App. 1 Cir. 4/21/14) (unpublished writ action). It does not appear that Porter took any further action on this writ.
In this assignment of error, the defendant argues that the district court denied him representation of his counsel of choice in violation of his rights under the Sixth Amendment.
Like the Sixth Amendment to the federal constitution, the Louisiana Constitution ensures the same right to the assistance of counsel for a criminal defendant. Louisiana Constitution article I, section 13 provides in pertinent part: “At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment.” State v. Reeves, 06-2419 (La. 5/5/09), 11 So.3d 1031, 1056-57, cert. de *692 nied, 558 U.S. 1031, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009). As a general proposition, a person accused in a criminal trial has the right to counsel of his choice. Similar to the federal court, the Louisiana Supreme Court has determined that the right to counsel of choice extends to a criminal defendant who has hired his own counsel. In addition, the right to counsel of choice extends to a defendant who has had an attorney hired for him by a collateral source. Id. at 1057.
The United States Supreme Court has found structural error violating the Sixth Amendment and requiring reversal where a criminal defendant has been denied his right to retained counsel of choice, or where a criminal defendant has been denied the representation of counsel of choice willing to donate his services. Reeves, 11 So.3d at 1056 (citing United States v. Gonzalez-Lopez, 548 U.S. 140, 150, 126 S.Ct. 2557, 2564, 165 L.Ed.2d 409 (2006)). Where the right to be assisted by counsel of one’s choice is wrongly denied, no harmless-error analysis that inquires into counsel’s effectiveness, or prejudice to the defendant, is required. Reeves, 11 So.3d at 1056 (citing Gonzalez-Lopez, 548 U.S. at 148, 126 S.Ct. at 2563).
The right to counsel of choice must be exercised at a reasonable time, in a reasonable manner, and at an appropriate stage within the procedural framework of the criminal justice system of which it is a part. State v. Lee, 364 So.2d 1024, 1028 (La. 1978). The right to counsel cannot be manipulated to obstruct the orderly procedure of the courts and cannot be used to interfere with the fair administration of justice. State v. Seiss, 428 So.2d 444, 447 (La. 1983).
Porter and Foxworth were enrolled as counsel of record and subsequently filed a motion to withdraw in response to the State’s complaint filed with the disciplinary board. Porter explained that he and Foxworth filed the motion to withdraw “months ago ... just to protect [themselves] with the bar association.” He indicated that he and Foxworth filed the motion to withdraw solely because the disciplinary complaint had been filed against them; they did not truly wish to be removed from the case. It is somewhat unclear why Porter and Foxworth did not withdraw the motion after receiving favorable rulings from this Court and the Louisiana Supreme Court. Even so, Porter was under the impression that the district court would deny the motion, as indicated by his statement that he was “stunned and shocked” after the motion to withdraw was granted. After his motion to' withdraw was granted, Porter immediately, in the same hearing, orally moved that the district court reconsider its ruling, making it clear that he wished to continue representing the defendant. Shortly thereafter, Porter filed a written motion to re-enroll.
Nothing in the record suggests that Porter or Foxworth were attempting to manipulate the proceedings. Rather, the motion appears to have been filed in an effort to protect defense counsel from possible disciplinary action arising from the State’s complaint. Moreover, the defendant made it abundantly clear that, despite the motion | uto withdraw, he desired defense counsel to continue to represent him. Based on these facts, we cannot conclude that counsel was attempting to manipulate the orderly procedure of the courts or interfere with the fair administration of justice by filing a motion to withdraw, followed by motions to re-enroll.
Given the unique facts presented herein, we are constrained to find that the district court abused its discretion in denying the motions to re-enroll. This is espe- *693 daily true in light of the district court’s ruling finding that no conflict existed to warrant the withdrawal, the higher courts not reversing that finding, and the defendant’s continued expressed desire to be represented by Porter and Foxworth. Compare State v. Brown, 03-0897 (La. 4/12/05), 907 So.2d 1, 12-14, cert. denied, 547 U.S. 1022, 126 S.Ct. 1569, 164 L.Ed.2d 305 (2006) (wherein the court found that allowing the withdrawal of the defendant’s retained counsel, over the defendant’s objection, was proper based on sufficient evidence of an actual conflict of interest to justify the dismissal of the counsel). This error depriving the defendant of his counsel of choice is a structural error that is not subject to harmless error review. See Reeves, 11 So.3d at 1056. Therefore, this assignment of error has merit. Accordingly, we pretermit discussion of the defendant’s second counseled and second pro se assignments of error and remand the matter to the district court for a new trial in accordance with this opinion.
CONCLUSION
For the foregoing reasons, we reverse the defendant’s convictions, vacate the defendant’s sentences, and remand for a new trial.
CONVICTIONS REVERSED; SENTENCES VACATED; MATTER REMANDED FOR NEW TRIAL.
Whipple, C.J., dissents and assigns reasons.

. Co-defendant Mark Young was also charged with both counts in the same indictment, but was subsequently acquitted in a separate trial.

. A projectile was collected from Casey’s left chest cavity and two fragments were recovered from his right shoulder and right collarbone.

. On September 18, 2013, on the defense’s motion, trial was continued to March 24, 2014.