McCLENDON, J.
*931 The defendant, Kenneth Jackson, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1, and pled not guilty.[1] The trial court denied the defendant's motion in limine to prevent the State from introducing other crimes evidence pursuant to LSA-C.E. art. 404(B). Following a bench trial, the defendant was found guilty as charged. The defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant now appeals, assigning error to the admission of other crimes evidence and the sufficiency of the evidence. For the following reasons, we affirm the conviction and sentence.
STATEMENT OF FACTS
On November 4, 2014, at approximately 2:00 p.m., Deputy Brandon Travis, Sr., of the Iberville Parish Sheriff's Office (IPSO), was patrolling the Plaquemine area when he received a dispatch reporting spousal abuse of Vanessa Jackson. Deputy Travis was instructed to meet Vanessa at the NAPA Auto Parts and Supplies store on La. Highway 1, and proceeded to that location. After waiting for up to five minutes, Deputy Travis called the dispatcher and was informed that Vanessa should have arrived within a few minutes of the initial dispatch. Deputy Travis decided to leave NAPA and proceeded to Jackson's residence, located at 57638 True Hope Lane. The residence was described as a mobile home sitting perpendicular to the roadway with a front left-side porch. When Deputy Travis arrived at the residence, he observed Vanessa's husband (the defendant) in the yard, towards the rear of the trailer, standing over a body with a knife in his hand. Deputy Travis immediately exited his vehicle and upon the officer making eye-contact with the defendant, the defendant threw the knife towards the front of the porch. Deputy Travis commanded the defendant to get down on the ground to be placed in handcuffs. The defendant did not comply with Deputy Travis's order. IPSO Lieutenant Will Dangerfield, who arrived on the scene shortly after Deputy Travis, brandished his taser and commanded the defendant to get down, and the defendant complied. The defendant was then handcuffed and transported to jail, as the officers secured the scene.
When IPSO Detective Mark Graves arrived at the scene at approximately 2:10 to 2:15 p.m., the first responding officers had secured the scene. Emergency personnel were rendering aid to a male subject, Brandon King (the victim), Vanessa's twenty-six-year-old son. Detective Graves noticed a silver, bloody, large-blade knife on the ground near the steps of the front porch. He further observed blood next to the victim, who was lying on the ground near the rear steps of the porch, and a rocking chair that appeared to have been knocked over from the porch. After entering the mobile home, Detective Graves took a statement from Vanessa, who also showed the detective a bruise on her right bicep. He further observed her swollen right wrist, a red abrasion on her left cheek, bruising to the back of her lower neck and shoulder area, and redness to her ear where the defendant reportedly ripped her earring out. Vanessa was taken to the Sheriff's Office to provide a full interview *932 before seeking medical attention. Detective Graves did not see any blood on the porch or in the residence. None of the furniture or other contents of the residence appeared to be disturbed or out of place, and there were no signs of a struggle therein. Based on his observations, Detective Graves concluded that the victim sustained his injuries while in the yard, not on the porch or in the residence.
Upon his arrest, the defendant was fully advised of his Miranda[2] rights and waived them, participating in a video-recorded interview. He described the incident with Vanessa before the stabbing as a "shoving match." At the outset, he claimed that he was protecting himself during the stabbing incident at issue. The defendant stated that when the victim arrived, he began kicking the front door. As the defendant further indicated, when he opened the door, the victim "bum-rushed" into the house and began making complaints of the defendant hitting his mother. The defendant stated that the victim bear-hugged him and tried to punch him.[3] The defendant stated that he picked up the knife, possibly knocking over the knife block in the process, as the victim continued to approach.[4] The victim grabbed the defendant, and they went out of the door and fell off of the porch, as the victim was still "trying to punch" the defendant. According to the defendant, the victim then grabbed the defendant's hand, in an attempt to take the knife. The defendant admitted that he stabbed the victim during the tussle.[5] He stated that he immediately complied with the police, who told him to approach them after he tossed the knife.
The day after the stabbing, in light of the defendant's post-arrest claims that the victim attempted to kick the door in and of an altercation taking place inside prior to the stabbing, the officers re-inspected the home before allowing Vanessa to reenter the residence. Detective Graves noted and photographed minor damage to the entry/exit door. Detective Graves further measured the distance from the doorway to the edge of the porch at approximately fourteen feet and four inches. He again did not see any signs of a struggle in the residence. A knife block with one missing knife was sitting upright on the kitchen counter, against the back wall between the cabinets. The distance from the edge of the porch to where the victim's body was located was another three feet, approximately. Thus, the victim's body and blood were located approximately seventeen feet from the front doorway of the residence.
The victim suffered three stab wounds, specifically to his upper back (left posterior shoulder), left forearm, and his right *933 lower neck. The victim died as a result of his stab wounds.
SUFFICIENCY OF THE EVIDENCE
In assignment of error number two, the defendant assigns error to the sufficiency of the evidence. The defendant argues that the trial court erred in finding the State sufficiently proved that he was not acting in self-defense when he stabbed the victim. The defendant argues that he was defending himself from his enraged stepson inside of his own home. Thus, the defendant does not dispute that the victim's death was a result of being stabbed by the defendant. The defendant contends that at the time of the offense, he was inside of his home, a place where he had a legal right to be. The defendant also alleges that the victim did not live at the defendant's house at the time of the offense and did not have a key to the house.
The defendant contends that Vanessa was concerned about what the victim would do after she told him that she was hit by the defendant. The defendant argues that Vanessa's concerns were consistent with the defendant's testimony that when the victim arrived at his residence, he began beating and kicking the door, and yelling that he was going to kill the defendant for hitting his mother. The defendant asserts that his version was supported by testimony presented by his nephew, Shawn Howard. He contends that he and Howard were having a telephone conversation when the victim arrived, and that Howard could hear a banging noise. The defendant claims that he opened the door because he was afraid that the victim would destroy it, that he backed into the kitchen when the victim entered the residence, and that he picked up the knife from the counter to urge the victim to leave. The defendant further claims that the victim initially appeared compliant before suddenly rushing into the defendant, causing both men to fall out of the house and off the porch as a struggle ensued. The defendant contends that the victim was stabbed three times during the struggle. The defendant concludes that the evidence presented by the State in an attempt to show that the victim was not the aggressor was not credible and was disputed by other testimony.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. See LSA-C.Cr.P. art. 821(B) ; State v. Ordodi, 06-0207 (La. 11/29/06), 946 So.2d 654, 660 ; State v. Hearold, 603 So.2d 731, 734 (La. 1992).
In conducting the review under Jackson , we also must be expressly mindful of Louisiana's circumstantial evidence test, i.e., "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438 ; State v. Wright, 98-0601 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157 & 00-0895 (La. 11/17/00), 773 So.2d 732. When a case involves circumstantial evidence and the fact finder reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, *934 that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. See State v. Captville, 448 So.2d 676, 680 (La. 1984) ; State v. Taylor, 97-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932.
The crime of second degree murder, in pertinent part, "is the killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" LSA-R.S. 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625 (La.App. 1 Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So.2d 923. Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun. State v. Maten, 04-1718 (La.App. 1 Cir. 3/24/05), 899 So.2d 711, 716, writ denied, 05-1570 (La. 1/27/06), 922 So.2d 544 ; see also, State v. Brunet, 95-0340 (La.App. 1 Cir. 4/30/96), 674 So.2d 344, 349, writ denied, 96-1406 (La. 11/1/96), 681 So.2d 1258.
A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. LSA-R.S. 14:20(A)(1). However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. LSA-R.S. 14:21. When the defendant in a homicide prosecution claims self-defense, the State must prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Williams, 01-0944 (La.App. 1 Cir. 12/28/01), 804 So.2d 932, 939, writ denied, 02-0399 (La. 2/14/03), 836 So.2d 135.
Deputy Travis described the defendant's demeanor upon the deputy's approach as follows, "like his adrenaline was pumping and he had like a - there was like an empty stare in his eyes, kind of like he was in a trance." He further described the defendant's eyes as "scary," noting that the defendant was in an apparent "deep gaze." Lieutenant Dangerfield likewise stated that the defendant initially stood there, breathing heavily, and staring at the officers while failing to respond to Deputy Travis's order to get down on the ground.
Detective Graves testified that he had eighteen years of police experience. In his opinion, there would have been items disturbed in the residence based on the defendant's version of the story. He agreed on cross-examination that the damage to the door was consistent with someone kicking the door, and that there could have possibly been a struggle at the doorway that spilled over onto the porch. He noted that the knife block was upright and not turned over, despite the defendant's indication that he may have knocked it over. Deputy Graves further classified the victim's stab injury to his left forearm as a defensive wound.
Antoinette Green, Vanessa's cousin, testified that the defendant and the victim had a strained relationship. About two years before the stabbing, Green witnessed *935 an incident between the defendant and the victim at the Jackson residence. When Green first arrived that day, she observed the defendant and the victim fighting. The victim slipped and the defendant pulled out a gun and held it to the victim's head. Green immediately began screaming and pleading to the defendant, asking him not to kill the victim. As Green continued to beg the defendant not to kill the victim, the defendant moved the gun and stated, "...you could thank her because she saved your sorry ass life today." Vanessa testified consistent with Green as to the prior incident.
Vanessa and the defendant had been married for about four years by the time of the offense, and they lived in the mobile home purchased by Vanessa in 2001. Vanessa indicated that the defendant became verbally and physically abusive about one year into the marriage, contending that he would often belittle and strike her. Prior to their marriage, Vanessa had one child, Brandon King, the victim. Vanessa testified that the victim, her only child, was always welcome at her home. She indicated that the defendant would criticize her for having the victim "spoiled," complaining that she should "let him be a man."
Vanessa testified that the knives in the block on the kitchen counter were rarely used, noting that she had other knives. She specifically stated that the large knife used by the defendant to kill the victim was not left sitting out on the counter that day. Prior to the stabbing, the defendant and Vanessa had an argument and the defendant abruptly began punching her and hitting her in the face. Vanessa further testified that the defendant repeatedly called her ungrateful, as he hit her in the face, knocked her earring out, and hit her in the back and arm. Vanessa further stated that the defendant would not allow her to get her phone, noting that she wanted to call 911. The defendant continued to follow her as she entered the bathroom, and went back to the bedroom before exiting the house and walking around in the yard. She informed the defendant that she was going to visit Green, who lived across the street at the time, but the defendant stated, "no you [sic] not... what you think I won't drag you across this yard?" Vanessa then reentered the mobile home. At this point, the two o'clock hour was approaching. In an effort to coax the defendant into allowing her to leave, Vanessa told him that she wanted to bring ice cream to her mother, who suffered from health issues at the time. As Vanessa was leaving, the defendant warned her against calling the police or summoning members of her family, stating, "...you can go get your family and you can go call your brother or your son, and if your son bring his ass here today this is going to be the day he die."
When Vanessa arrived at her mother's house nearby, she was shaking and nervous. The victim, who also lived there, was not home at the time. She called the victim and told him that the defendant had hit her. She also called Green and the police. The police asked Vanessa a series of questions before instructing her to meet them at NAPA. Vanessa lost contact with the victim and was unable to tell him that she had contacted the police and arranged a meeting at NAPA. Vanessa admitted that she was concerned because the victim was protective of her, and because the defendant and the victim were temperamental. Thus, she headed back to her mobile home. On the way, the victim passed her as she unsuccessfully tried to flag him down. As they arrived at the mobile home, Vanessa parked in her next-door neighbor's yard and the victim parked across the driveway. She exited her vehicle, running behind the victim as he went up the porch steps.
*936 Vanessa further testified that when the victim went up the steps, the screen door was closed but the main door was open, as the defendant stood in the doorway. The victim asked the defendant, "why you hit my momma?" As to what happened next, she testified, "Kenneth bust out the door and Brandon went on the ground, all the way across the porch. He knocked him all the way across the porch when he landed on his back on the ground." She noted that the rocking chair fell over as the victim landed on the ground. The defendant was on top of the victim at that point. Vanessa testified that she was unaware that the defendant had a knife until her son stated, "Momma he's stabbing me [.]" The victim repeated the statement twice before becoming silent. Vanessa repeatedly confirmed that she never lost sight of the victim, and that the victim did not enter the mobile home. She further testified that the victim did not kick the door, stating that the damage to the door as depicted in the photographs "has been there forever." She indicated that she was unsure "when [the damage] happened, but it didn't happen that day. It didn't happen that day." She reiterated that she had lived in the trailer for thirteen years at the time of the offense.[6]
Shawn Howard, the defendant's nephew, recalled having a telephone conversation with Vanessa on the day in question, at which point she stated that she and the defendant had an altercation that day. Howard testified that he called the defendant and called Vanessa back on a three-way call.[7] He further testified that while he was on the phone, he could hear what he believed to be someone beating on the door. The defendant informed him that it was the victim beating on the door. Howard then heard the "other party" say, "I told you I was going to 'F' you up if you mess with my momma again." He then heard a perceived scuffle just before the phone call was discontinued.
The defendant testified that after Vanessa arrived home on the day in question they "had some words" over something trivial.[8] He noted that he must have said something to upset Vanessa, adding, "[s]he could be really very disrespectful when she want to..." (R. 267). He explained that he grabbed her hand and wrist and pushed her after she ran up to him, describing her actions as a "get-in-your-face-type thing[.]" (R. 267). According to the defendant, the argument continued for a few minutes before he went outside to the shed. Vanessa left after telling the defendant that she was going to her mother's house.
The defendant further testified that he was on the telephone with Howard before the victim arrived. He noted that Howard also called Vanessa and set up a three-way call, though Vanessa was unaware that the defendant was listening as she spoke to Howard. He further testified that he was still on the phone with Howard when the victim arrived and began beating on the door. He contended that he opened the door to prevent the victim from tearing it up, claiming that the victim was repeatedly kicking the door before he opened it. He testified that he knew it was the victim, *937 stating, "He said he was going to 'F' me up, f*** me up, kill me, and whatever." The defendant further testified that as he was in the process of opening the door, the victim ran inside, and the defendant told the victim, "man, chill out." The defendant added, "...this cat is in so much rage that, you know, he like -- the dude is spooking me now, you know, so in the process of this - in the process of this, I steps back. When I steps back, I steps back to the back to like go toward the kitchen." The defendant testified that the victim remained in his face as he begged him to leave. The defendant added, "His thing was I'm going to f*** you up; I'm going to kill you." The defendant testified that there had been no physical contact by that point.
After backing up, the defendant saw the knife "laying on the counter," picked it up, and swung it in an attempt to "spook this guy off." The defendant stated that when he swung the knife, the victim began backing up toward the door. The defendant further stated, "...when we get to the door seal, right in the door seal, for some crazy, for some strange reason the dude just like bum-rushed me. So when he run into me, I'm running into him." He further stated, "...what I was trying to only do was get this guy off me, and then we - and when he body hugged me, I run into him; we fall off the porch." The defendant testified that he and the victim then scuffled on the ground, and when the defendant stood up, the victim did not. He stated that Vanessa arrived a few minutes after he got up from the ground, followed by the police and an ambulance.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. Thus, an appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. Williams, 804 So.2d at 939. Regarding the defendant's claim that he acted in self-defense, the relevant inquiry on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. Id.
The defendant's rendition of the facts significantly shifted from the point of his post-arrest interview to his trial testimony. While his post-arrest interview indicated that the victim "bum-rushed" him immediately after entering the mobile home, followed by a physical struggle therein, by the time of the trial the defendant indicated that the struggle abruptly began as the victim was proceeding to exit the mobile home. Further, while the defendant maintained at trial that Vanessa arrived after the stabbing, during the interview, he repeatedly accused Vanessa of bringing the victim to the home to initiate the confrontation. The defendant specifically contemplated as to why Vanessa would bring the victim over there after her altercation with the defendant, surmising, "I guess she thought that he was going to kick my ass." During her interview at the scene with Detective Graves and during her trial testimony, Vanessa indicated that she and the victim arrived at the scene at the same time, consistent with the defendant's post-arrest interview statements. Vanessa further stated that the next door neighbor's yard was immediately adjacent to theirs and that she observed the victim from the point that he exited his vehicle and approached the porch, to the point that the *938 defendant darted out of the front door and attacked the victim, stabbing him repeatedly. Thus, the evidence supports a finding that the defendant was the aggressor in this case and, therefore, cannot claim the right of self-defense.
The guilty verdict in this case indicates that the trier of fact rejected the defendant's contention that he feared for his own life and stabbed the victim in self-defense. We conclude that a rational trier of fact could have found that the State established beyond a reasonable doubt that the defendant did not act in self-defense. Accordingly, we cannot say that the judge's determination was irrational under the facts and circumstances presented to him. See Ordodi, 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. State v. Calloway, 07-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire, 14-2295 (La. 1/27/16), --- So.3d ----, ----, 2016 WL 314814 (per curiam). We are convinced that any rational trier of fact, viewing the evidence presented at trial in the light most favorable to the State, could have found the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and that the offense was not committed in self-defense. Due to the foregoing conclusions, assignment of error number two lacks merit.
OTHER CRIMES EVIDENCE
In assignment of error number one the defendant challenges the State's use of other crimes evidence. The defendant notes that the State filed notice of its intent to admit evidence of other crimes pursuant to LSA-C.E. art. 404(B)(1). He further notes that the State presented testimony by Vanessa and Antoinette Green, Vanessa's cousin, to allege that two years before the instant offense, the defendant threatened the victim by pointing a gun at his head. The defendant argues that the cases relied upon by the State are not dispositive of the issue in this case. He notes that in this case, the other offense that he was accused of allegedly occurred two years before the instant offense. The defendant further contends that the circumstances of the prior and instant offense differed. Specifically, he claims that while the victim behaved menacingly toward him in the instant case, the other incident involved a fight wherein he threatened the victim with a gun. The defendant also contends that there was no reason or motive established for the prior threat and no testimony provided to establish why the altercation occurred. Thus, the defendant argues that the prior incident was not probative of motive or intent in the instant case. Further, the defendant avers that there is no allegation that the prior threat from two years ago was at all related to the instant offense or that the threat occurred for the same reason as the instant offense. The defendant argues the trial court should not have considered the prior threat when determining whether the elements of second degree murder were met in this case, nor in determining whether the State proved that the stabbing was not committed in self-defense. The defendant concludes that the other crimes evidence was not probative and should have been excluded. He contends that the error in admission was not harmless, arguing that *939 the trial court may have found that the killing was committed in self-defense if the court had not considered the prior threat.
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the substantial risk of grave prejudice to the defendant. To admit "other crimes" evidence, the State must establish that there is an independent and relevant reason for doing so, i.e. , to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act. See LSA-C.E. art. 404(B)(1) ; State v. Tilley, 99-0569 (La. 7/6/00), 767 So.2d 6, 22, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). Further, at least one of the enumerated purposes in Article 404(B)(1) must have substantial relevance independent from showing the defendant's general criminal character in that it tends to prove a material fact genuinely at issue. When the element of intent is regarded as an essential ingredient of the crime charged, it is proper to admit proof of similar but disconnected crimes to show the intent with which the act charged was committed. See State v. Jackson, 625 So.2d 146, 150 (1993). Motive evidence reveals the state of mind or emotion that influenced the defendant to desire the result of the charged crime. To have independent relevance, the motive established by the other crimes evidence must be more than a general one, such as gaining wealth, which could be the underlying basis for almost any crime; it must be a motive factually peculiar to the victim and the charged crime. State v. McArthur, 97-2918 (La. 10/20/98), 719 So.2d 1037, 1041.[9]
Additionally, the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. LSA-C.E. art. 403. Separate and apart from the showing of relevancy and prejudice, the State must also prove the defendant committed the other acts and satisfy the requirements set forth in State v. Prieur, 277 So.2d 126 (1973) and Article 404(B)(1), i.e. , upon request by the defendant, the State must provide the defendant with notice before trial it intends to offer prior crimes evidence. State v. Garcia, 09-1578 (La. 11/16/12), 108 So.3d 1, 39, cert. denied, 570 U.S. 926, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013).
In Garcia, the Court used a gatekeeping analysis and an abuse of discretion standard in reviewing the admission of other crimes evidence, to-wit:
Logically, it falls to the trial court in its gatekeeping function to determine the independent relevancy of [evidence of other crimes, wrongs, or acts] and balance its probative value against its prejudicial effect. Upon finding such relevance, the court must then balance all the pertinent factors weighing in favor of and against its admissibility. In this analysis, the court seeks to answer the question: Is this evidence so related to the crime on trial or a material issue or defense therein that, if admitted, its relevancy will outweigh the prejudicial effect, which the defendant will necessarily be burdened with?
The trial court's answer to this question and its corresponding ruling on the admissibility of the additional other *940 crimes evidence will not be disturbed absent an abuse of discretion.
Garcia, 108 So.3d at 39 (citations omitted).
Herein, prior to the trial, the State filed notice of its intent to introduce the other crimes evidence at issue and the defendant filed a motion in limine seeking to exclude the testimony. At the conclusion of the pretrial hearing, the trial court denied the defendant's motion in limine and ruled in favor of the State. The trial court found that the testimony was relevant to provide context for the killing, noting that the defendant was claiming self-defense.
We agree with the trial court in finding the other crimes evidence was materially relevant. Herein, the defendant identified the victim as the aggressor, indicating that he, the defendant, acted in fear in stabbing the victim. On the other hand, there was testimony indicating that the defendant stated before the stabbing that he would kill the victim if he came to the home on the day in question. We find that the evidence regarding the defendant's past threats and physical actions pertaining to the victim was independently relevant to show intent and absence of mistake or accident.[10] Because the defendant claimed he was acting in self-defense, the evidence of the older threats and physical attack was relevant to show he in fact intended to kill the victim and did not commit the offense in self-defense. The defendant's propensity to take actions such as holding a gun to the victim's head and verbally threatening to kill the victim were also relevant to show motive. We note that the trial judge heard detailed accounts of each incident separately, including the defendant's own pretrial statements and trial testimony, and we find no danger of confusing the circumstances. When the probative value of the other crimes evidence is balanced against its prejudicial effect, we find the evidence was properly admitted because it was not unduly or unfairly prejudicial. Accordingly, the trial court did not abuse its discretion in allowing the other crimes evidence to be admitted at trial or in denying the defendant's motion in limine. Considering the foregoing, assignment of error number one is without merit.
CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.

In a separate grand jury indictment, the defendant was charged with domestic abuse battery in violation of LSA-R.S. 14:35.3. See State v. Jackson, 2018-0262 (La.App. 1 Cir. 11/2/18), 265 So.2d 928. The State combined the charges for trial. However, the State nol-prossed the charge domestic abuse battery charge (in 2018-KA-0262) after the bench trial. Thus, there are no issues assigned in that appeal.

Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

Later in the interview, he again used the term "shoving match," at that point to describe an altercation in the mobile home with the victim. At approximately thirty-two minutes into the interview, the defendant began accusing Vanessa of planning the altercation with the victim, stating that when he looked out of the window (after the victim began kicking the door), he saw both Vanessa's car and the victim's car outside, which led him to believe that Vanessa brought the victim there to confront him.

Early in the interview, the defendant indicated that he did not plan to stab the victim, but initially picked up the knife in an attempt to protect himself and "scare him [the victim] off," as the victim kept trying to punch the defendant. At the end of the interview, the defendant stated that he was unsure as to why he picked up the knife.

The defendant specifically stated, in part, "Before I know'd it [sic], you know trying to save myself, I guess I must have, well not guess I did, it's obvious I did, I cut him, I guess I cut him."

Noting that the victim had a low level of Hydrocodone in his system (less than 0.05 micrograms/ml) at the time of the autopsy, the State introduced a pill bottle for Hydrocodone prescribed in the victim's name on October 29, 2014. Vanessa confirmed that the victim had a tooth pulled on October 29, 2014, six days before he was stabbed to death.

During the trial, Vanessa was not questioned as to whether she spoke to Howard on the day in question.

The defendant confirmed that his criminal history included a felony theft and burglary offense.

McArthur is superseded by LSA-C.E. art. 412.2 only with respect to other crimes evidence of sexually assaultive behavior. See State v. Wright, 11-0141 (La. 12/6/11), 79 So.3d 309, 316-17.

We note that at trial, the defendant testified that he initially swung the knife in an attempt to scare the victim, and indicated that he and the victim were scuffling on the ground when the victim was stabbed.