# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 23-661

STATE OF LOUISIANA

VERSUS

A. L. SIMMONS, II

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C 30193
HONORABLE LALA BRITTAIN SYLVESTER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

### CANDYCE G. PERRET
### JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Candyce G. Perret, Gary J. Ortego, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**Billy Joe Harrington**
**District Attorney, 10th Judicial District**
**Jason O. Methvin**
**Assistant District Attorney, 10th Juducial District**
**200 Church Street**
**Natchitoches, LA   71457**
**(318) 357-2214**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**Post Office Box 1481**
**Monroe, LA   71201**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **A. L. Simmons, II**

**PERRET, Judge.**

Defendant, A.L. Simmons, II, was charged by grand jury indictment with first degree murder of the victim, Allen Darrel Halford, in violation of La.R.S. 14:30.[1] Following a trial, a jury unanimously returned a responsive verdict of guilty of second degree murder. Defendant now appeals his conviction, arguing that the evidence adduced at trial failed to prove beyond a reasonable doubt that he was guilty of second degree murder. For the reasons discussed below, we affirm Defendant's conviction.

**FACTS:**

On August 19, 2020, Defendant was charged by criminal indictment with the first degree murder of Mr. Halford, which occurred on June 12, 2020. On September 9, 2020, a Motion to Appoint Sanity Commission was filed on behalf of Defendant. Thereafter, Defendant was evaluated by three doctors and was found competent to stand trial and to assist counsel.

On July 20, 2021, a Motion to Suppress Defendant's confession was filed. After a hearing, the trial court denied the motion and found that Defendant's statement was given freely and voluntarily. After a three-day jury trial in June 2023, a twelve-person jury unanimously found Defendant guilty to the responsive verdict of second degree murder. On July 11, 2023, the trial court sentenced Defendant to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.

Defendant now appeals, arguing that the evidence adduced at trial failed to prove beyond a reasonable doubt that he was guilty of the second degree murder of Mr. Halford.[2]

---

[1] According to the record, the victim went by his middle name, Darrel, instead of Allen.

[2] In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

**DISCUSSION:**

On appeal, Defendant contends that "the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that he was guilty of the second degree murder of Mr. Halford." The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. It is the factfinder's role to weigh the respective credibility of the witnesses, and the reviewing court will not second-guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson,* 425 So.2d 1228 (La.1983). The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied,* 15-1151 (La. 5/13/16), 191 So.3d 1054.

> A conviction based on insufficient evidence cannot stand as it violates Due Process. *See* U.S. Const. amend. XIV; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in *Jackson*, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the

2

crime beyond a reasonable doubt. *See* La. Code Crim. P. art. 821(B); *State v. Ordodi*, 06-207 (La. 11/29/06), 946 So.2d 654, 660. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. La.R.S. 15:438; *State v. Wright*, 98-0601 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 486, *writs denied*, 99-0802 (La. 10/29/99), 748 So.2d 1157, 00-0895 (La. 11/17/00), 773 So.2d 732. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. *State v. Captville*, 448 So.2d 676, 680 (La. 1984).

*State v. Coleman*, 17-1045, p. 6 (La.App. 1 Cir. 4/13/18), 249 So. 3d 872, 877, *writ denied*, 18-830 (La. 2/18/19), 263 So.3d 1155.

In the instant case, the jury unanimously found Defendant guilty of second degree murder. According to La.R.S. 14:30.1(A), second degree murder, in pertinent part, involves,

[T]he kill[ing] of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery . . . even though he has no intent to kill or to inflict great bodily harm.

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592–93, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007) (citations omitted).

According to Defendant, the investigating detectives testified that he admitted to shooting Mr. Halford during his interview, but that no evidence was provided to

3

corroborate the officers' testimonies, as they failed to produce a recorded statement. Moreover, Defendant asserts he had an alibi during the time of shooting, which was corroborated by witness testimonies and surveillance footage. Additionally, Defendant highlights the fact that the witness who testified as to what happened to Mr. Halford's vehicle, Mitchell Watkins, was never searched. Although an alleged struggle took place between Defendant and Mr. Halford, Defendant argues that no DNA evidence was recovered at the scene to link him to the shooting. Thus, Defendant contends his conviction should be set aside and a verdict of not guilty be entered because the State failed to prove beyond a reasonable doubt that he was guilty of second degree murder.

In opposition, the State argues it proved beyond a reasonable doubt that Defendant committed the second degree murder of Mr. Halford. To support its argument, the State notes that Mr. Watkins identified Defendant as the shooter when he testified at trial. Moreover, the State contends that Defendant called his mother, Rosa Simmons, from Mr. Watkins' cell phone, placing Defendant with Mr. Halford and Mr. Watkins at the time of the murder and not with his mother. Regarding the time discrepancy with the surveillance footage, the State argues that the jury believed Detective Jared Kilpatrick's statement about the incorrect time.

**SUFFICIENCY OF THE EVIDENCE:**

The State called Bernice Poole, Mr. Halford's older sister, as its first witness. Ms. Poole described Mr. Halford as "a good guy" that "cared about everybody more than he cared about himself." According to Ms. Poole, Mr. Halford was diagnosed with bladder cancer and was actively receiving treatment, which included pain and experimental medication. Ms. Poole testified that Mr. Halford received governmental assistance due to his cancer diagnosis and would typically carry around $1200 in cash.

4

The State also called Lieutenant Jonathan Byles of the Natchitoches Parish Sheriff's Office to testify. Lt. Byles stated that the victim had a five-dollar bill, an empty pill bottle, some change, and a .38 revolver in the console of his vehicle. Lt. Byles testified that he recovered a .38 caliber shell casing, which was "in the console," and a .380 shell casing, which was found "behind the driver's side passenger area, rear." The .380 weapon was not found in the vehicle. After a second search of the vehicle, Lt. Byles recovered "twenty-nine" twenty dollar bills, equivalent to "$580.00 in cash," "in the front dash of the vehicle" along with "an empty morphine pill bottle," "an Alcatel cell phone," and "three beer cans."

Lt. Byles testified he continued his investigation by assisting Detective Craig LaCour with attempting to locate a firearm at an apartment complex in Winnfield, where Defendant had allegedly been located. However, after a search of the apartment, no weapon was recovered. Lt. Byles testified that Jamarian Bush, a suspect, gave a statement to Detective LaCour while he searched the apartment for the weapon.

After the testimony of Lt. Byles, the State called Officer Donta Latchie of the Natchitoches Parish Sheriff's Office to testify. Officer Latchie testified that, on the date of the incident, he responded to a call in the Clarence[3] area, and upon arrival, he "noticed a white Dodge truck that was partially in the ditch and an older white male subject kind of slumped over it in the seat, driver's seat." Another officer, Trooper Silas Axsom, was also on the scene. Trooper Axsom indicated to Officer Latchie that the driver was deceased, so they proceeded to rope off the crime scene and find any potential witnesses. Thereafter, Officer Latchie ran across the street to speak with Mitchell Watkins, a friend of Mr. Halford who also witnessed the incident. Officer

---

[3] According to Wikipedia,"Clarence is a village in Natchitoches Parish, Louisiana[.]"

Latchie stated that Mr. Watkins had a calm demeanor and was talking to another male subject at the time.[4]

On the second day of trial, the State called Mary Loucious to the stand. Ms. Loucious testified that although she could not recall Defendant's name, she thought of Defendant as her play grandson and that she knew him as Rosa Simmons' son, a non-relative. After refreshing her memory, Ms. Loucious testified she knew Defendant as "Al," Al Simmons, Sr.'s son.[5]

Ms. Loucious testified that on the morning of the incident, Defendant was at her house and that he had spent the night before with her. Ms. Loucious testified that Defendant would stay "whenever he felt like it" and that she did not keep track of how often he would stay. The night before the incident, Ms. Loucious testified that Defendant "showed [her] a gun" and "asked [her] if [she] had any bullets," which she stated in the affirmative, indicating "[she] had seven bullets." Ms. Loucious testified that Defendant "asked [her] for one" and she responded that "[she] couldn't give him one." According to Ms. Loucious, Defendant "only had one gun."

Ms. Loucious testified that on the morning of the incident, she, along with Mr. Halford, sat down at a table in her yard, wherein she purchased some pills. Ms. Loucious testified, afterwards, she believed Defendant "got into the vehicle" with Mr. Halford and Mr. Watkins and "went to the store." Ms. Loucious stated that after they left, she was contacted by someone from Clarence about the shooting and that she drove to Clarence after "[she] heard what had happened." After being shown a photograph of

_____

[4] The record indicates that at one point, Officer Latchie refers to Mitchell Watkins as "Mr. Grayson."

[5] According to the testimony of Rosa Simmons, Defendant was named after his grandfather, Rosa Simmons' father, and that Defendant's father is Robert Evans.

Mr. Halford, Ms. Loucious stated she thought the man on the photograph was "the white man" that "was in [her] house that day."

On cross-examination, Ms. Loucious was asked her reasoning for purchasing medication from Mr. Halford. Ms. Loucious responded that her physician at the time was not prescribing any medication and that she was in constant pain from being shot three times. When the defense questioned Ms. Loucious as to how she obtained Mr. Halford's information, Ms. Loucious testified that a person, who was "at the courthouse," brought him down there, but she could not recall his name at that time. According to Ms. Loucious, that was the first time she purchased pills from Mr. Halford.

On re-direct, the State clarified who all were present at Ms. Loucious' house on the date of the incident. According to Ms. Loucious, it was her, her husband, and Defendant at first, and then, "the white guy [Mr. Halford] and the black guy [Mr. Watkins]" showed up. Ms. Loucious further testified that whenever the white guy and black guy left, Defendant got into the vehicle with them and also left.

Next, the State called Mr. Watkins to testify. Mr. Watkins testified that he recognized Defendant as the person who "killed [his] best friend," Mr. Halford. According to Mr. Watkins, he and Mr. Halford had known each other for about three years and described Mr. Halford as a "real nice man" that would "give you the shirt off his back."

Regarding the timeline of events, Mr. Watkins testified that Mr. Halford called and asked Mr. Watkins to accompany him to Ms. Loucious' house in St. Maurice. Mr. Watkins testified that Mr. Halford did not know exactly where Ms. Loucious' house was located so he rode with Mr. Halford to provide him with directions. Whenever they arrived at Ms. Loucious' house, both individuals got out of the vehicle and, while Mr.

Halford spoke with Ms. Loucious, Mr. Watkins stood by the truck and smoked a cigarette. Mr. Watkins stated that after Mr. Halford made the transaction, Mr. Halford proceeded back to the truck, wherein Defendant approached Mr. Halford and told Mr. Halford that he needed a ride to the store. Mr. Watkins further testified that whenever they approached the stop sign by Ms. Loucious' house, Defendant stated he did not want to go to the store right there in St. Maurice, he wanted to go to a store in Clarence. Mr. Watkins stated that he told Mr. Halford to "get rid of" the kid and that the kid was "up to no good." Mr. Halford agreed to take Defendant to the store in Clarence but advised Defendant that was "the end of the road."

Mr. Watkins testified that after they got to Clarence, Mr. Halford gave him money to purchase a twelve pack of beer. Afterwards, Mr. Watkins testified that Mr. Halford told Defendant to leave, but Defendant refused because he was "dirty," as in having an illegal substance in his possession and asked Mr. Halford to bring him to the projects. Mr. Watkins said that whenever they got to the projects, he told Mr. Halford "do not turn in there" and that's when Defendant pulled out the gun and told Mr. Halford to "give [him] the money." Mr. Watkins could not recall the exact amount of money Mr. Halford had in his possession; however, Mr. Watkins stated, "it was a good bit." According to Mr. Watkins, Mr. Halford had the money sitting in a "little hole" in the dash of the truck in plain view.

Mr. Watkins discussed the shooting, as follows:

A.     And then, so, when he asked Darrell about giving the money, Darrell mashed on the truck and told me to hold on, he went to driving like this, driving like that, you know what I'm saying? Then he shot him. When he shot him, he went across the road, come [sic] back across the road and hit a fence. And this young man here, while the truck was rolling, he jumped out the truck. So, me, I'm getting down on the floorboard because I'm thinking, I'm thinking I'm next.

Q.     Okay.

8

A.     You know.  And I question God right now, you know, I know it wasn't my time because this young man was sitting behind me.  If he shot me, I'd never [sic] seen it coming.  You know what I'm saying? I'd never [sic] seen it coming.

Q.     Okay. Did you ever see the gun?

A.     Sir?

Q.     Did you see the gun?

A.     No sir.

Q.     Okay.  Where was, where was the young man sitting?

A.     He was sitting behind me, sir.

Q.     Okay.

A.     You know, and then I'm the strongest person in the vehicle.  You know, this man, you know, got a colostomy bag, you know and stuff and having problems breathing.  Hey, he'd shot [sic] me and I'd never seen it coming.

Q.     Okay.  And the truck, where did the shooting occur, what town?

A.     Huh?  It was in Clarence, Louisiana.

Q.     Okay.  And did Mr. Halford ever pull a gun?

A.     No sir, he did not.
Q.     Okay.

A.     And also, you know, I knew Darrell.  He kept a gun, a .38.  He kept it in the console.

Q.     Okay.

A.     You know what I'm saying? But up under pressure, you know, I forgot all, I forgot all about the gun.  All I could think about, oh, oh man, man why did you do this?  Why?  Why?  All you had to do is ask him for it.  He would have gave [sic] you the shirt off his back.  If you was [sic] in the North Pole, you had a jacket, he had a long sleeve shirt, he would take that long sleeve shirt off and give it to you.  That's just what type of person he was.

Q.     And what happened to the money in the truck?

9

A.     That young man there got it and took off running towards the project, jumped out the truck and took off running.

Q.     Okay. And you stayed at the scene?

A.     Yes sir, I did.

Q.     Okay.  Until the police arrived?

A.     Yes sir, I did.

Q.     Okay.  And you told them what happened, is that right?

A.     Yes sir, I did.

Mr. Watkins further testified that Ms. Loucious gave him Mr. Halford's cell phone whenever she drove home that day since Mr. Halford left it at Ms. Loucious' house that morning.

Following the testimony of Mr. Watkins, the State called Captain Daryl Winder of the Natchitoches Parish Sheriff's Office to the stand.  Captain Winder stated that on the date of the incident, he received a call from the Marshall of Clarence, Ms. Eartha Hall, in reference to a vehicle accident on Greenville Drive in Clarence.  Captain Winder testified that he "later learned that there was a shooting victim inside the vehicle."  According to Captain Winder, he received the name of Defendant, the suspect, from Officer Latchie, the deputy on scene.  Captain Winder testified that he was on his way towards the Campti area, as he knew the Simmons family, when his Major asked him to return to Natchitoches to interview a witness, Mr. Watkins.[6]

Captain Winder then discussed his interview with Mr. Watkins, stating the following:

A.     Well, at the interview, I sat in on the interview with Mr. LaCour, and when we was [sic] talking to Mr. Watkins, he stated that he was at Ms. Loucious' house on the day in question, and him and the deceased, they

---

[6] According to Wikipedia, "Campti is a town in the northern part of Natchitoches Parish, Louisiana[.]"

10

were both there visiting Ms. Loucious at the time, and they were sitting in the yard. Of course, the suspect was there too, at that time.

Q.    Okay.

A.    And they got up to leave, Mr. Watkins and the victim got up to leave and the suspect asked if he could catch a ride. Mr. Simmons got in the vehicle with them and they traveled towards Clarence. He actually asked if he could catch a ride, in which they agreed that he could ride to Clarence. And they did.

Q.    Okay.

A.    They rode to Clarence, stopped at the, what they call a Tiger Stop, which that's a store at the intersection of Highway 71 and 84, where Mr. Watkins got out and purchased some beer.

Q.    Okay.

A.    At that point, according to Mr. Watkins, Mr. Simmons asked to use his phone, and Mr. Watkins allowed him to use his phone. Watkins got the beer, came back out, and Mr. Simmons asked if they could take him to the Camp, Campti area. In which Mr. Watkins told him that, and the victim told him that he could not go to Clarence, that he would have to get out there. He couldn't go to Campti, he had to get out in Clarence. He asked him if he could take him in projects. The projects is [sic] over behind the Grayson Barbecue pit.

Q.    Okay. What, [ ] street is the entrance to the projects?

A.    It's Greenville Drive.
Q.    Okay.

A.    The victim agreed to take him to the projects. They turned in on Greenville. Mr. Simmons asked that well, actually, he pulled out a pistol and told him to give him the money.

Q.    And that's according to Mr. Watkins, is that right?

A.    That's Watkins, Mr. Watkins tell [sic] that.

Q.    Okay.

A.    At that time, the victim, the driver, told him no, that wasn't going to happen. And he said, if you don't give me the money, I'm going to take it. At that point, the victim started driving erratically. And according to Mr. Watkins, when he started driving erratically, the victim and Mr. Simmons got to tussling, and he heard a gunshot go off. And the vehicle ended up in the ditch, hit a fence, and then into the ditch.

11

Q.  Okay.  And did you do an interview with Mary Loucious?

A.  I did.

Q.  Okay.  Did she confirm that, that, the suspect and defendant here was the one that got into the truck?

A.  Yes.

Q.  Okay.  And she didn't know Mr. Watkins by name?

A.  No.

Q.  And she also didn't know Mr. Halford by name, is that right?

A.  That's correct.

Following his discussion with Ms. Loucious, Captain Winder stated that he executed a search warrant for Ms. Rosa Simmons' home, wherein he found a .380 caliber pistol.  The pistol ended up not being related to the investigation.

Captain Winder testified that he, along with Major Reginald Turner, went to the Natchitoches Detention Center to interview Defendant.  Captain Winder stated that prior to interviewing Defendant, he read and advised Defendant of his constitutional rights, as evidenced by Defendant's signature on the "Natchitoches Parish Sheriff's Office Miranda Warning" form.  Captain Winder testified as follows:

Q.  Okay.  So, what did Mr. Simmons tell you?

A.  When we sat down and talked to Mr. Simmons, I kind of got him comfortable.  We talked.  I'm familiar with him and his family.  And he basically told me that, yes, he did ride to Campti, to the Clarence area.

Q.  Did he, did he tell you who he went with?

A.  He did.  He told Mr. Halford.

Q.  Okay.

A.  And Mr. Watkins.

Q.  Okay.

12

A.     He caught a ride, caught a ride to Campti, I mean, to Clarence. Stopped at Clarence, tried to call his mother.  He borrowed the phone, tried to call his mother.  He never could get her to answer the phone. He then asked if they would take him over into the projects.  Once he started in the projects, he did, in fact, pull a pistol.  And the reason he pulled a pistol is because he thought Mr. Watkins had took [sic] something from Ms. Mary.

Q.     Okay.  What, what specifically did he say Mr. Watkins took?

A.     He, he said money.

Q.     Okay.

A.     Had taken money from Ms. Mary Loucious.  And he was going to get it back is what he told us.  And he, once he told Mr. Watkins that, told Mr. Halford that, he pulled out his pistol, Mr. Halford resisted.   Mr. Halford, according to him, Mr. Halford tried to go in the center console of his truck where he, Simmons seen a pistol, and he slammed the console down on Mr. Watkins [sic] hand to keep him from getting the pistol.  And that's when Mister, I mean, Mr. Halford went to driving erratically and ended up, Mr. Halford was telling Mr. Watkins, who was down on the floor, balled up in a knot, was telling him to get the gun, shoot him, shoot him, shoot him.  And he said that's when he shot him.

Q.     And that's what Mr. Simmons told you, is that right?
A.     That's correct.

Q.     Okay.  Did he say anything about him or me?

A.     Yes.  He said it was either him or them.

Q.     Okay.  Did he ever deny being there?

A.     He did not.

Q.     Did he say that he was doing laundry with his mother?

A.     No, he didn't.

Q.     Okay.  This was, so, you continued the interview, is that right?

A.     I did.

Q.     Okay.  You did not start recording this interview, is that right?

A.     I did not.

Q.     Okay.  Why didn't you do that?

A.     Well, I'm learning more now.  I didn't start the interview, I wanted him to get comfortable with me.  These twenty-seven years I've been working in law enforcement, I usually, when I interview a suspect, I usually get them comfortable with me.  I try to talk to them, get them comfortable, so they can talk to me.  Because a lot of times they want to know what I know.  And once I get them comfortable, they'll talk.  Basically, this is what I done [sic] with Mr. Simmons.  I got him comfortable, then I went to talking to him about the events that took place.  He volunteered every bit of that information to me.  Simmons volunteered that information to me because he was comfortable with me.  And when we finished, I said, I'd like to get a recorded statement from you to put that on tape, what he said.  And he said, I don't mind talking to you, Mr. Winder, but I'd rather have an attorney present. Well, at that point, I quit talking to him.  And I understood that.

Thereafter, Captain Winder concluded his interview with Defendant.[7]

Next, the State called Major Turner of the Natchitoches Sheriff's Office Investigations Division to testify regarding his involvement with the case.  Major Turner stated that the day after the incident, he accompanied Captain Winder to interview Defendant at the Detention Center.  Major Turner's testimony regarding the interview with Defendant went as follows:

Q.     Okay.  What did, what did Mr. Simmons say?

A.     Well, we . . . started the interview, of course, you know, we read him his Miranda warnings, and of course, he acknowledged.  We read the waiver, he signed.  He acknowledged that he would talk.  He didn't want an attorney at that time.  He would talk.  And basically, we let him talk. We let him tell his side of the story.

Q.     Okay.

A.     And he talked.

Q.     Okay.

A.     Yes sir.

Q.     And what do you remember him saying?

---

[7] Defendant acknowledged talking with "Daryl," (Captain Winder) during a recorded conversation with his mother on the Detention Center's phone line.

14

A.     Well, he goes on to start that he was at Ms. Loucious' house and that she had some visitors.  The white guy, black guy.

Q.     Okay.

A.     He stated that the black guy, which, you know, later we found out was Mr. Watkins.

Q.     Okay.

A.     Went in the house to use the restroom, and that he kept fixing his clothes up and that he stole some money from Ms. Loucious.

Q.     A.L., A.L. thought that . . .

A.     That Mr. Watkins stole . . .

Q.     Stole some money.

A     . . . some money from Ms. Loucious.

Q.     Okay.

A.     That is correct.

Q.     All right.  Continue.

A.     And if I recall, I don't think he said Ms. Loucious.  I think he said Granny Loucious or something to that effect.

Q.     Okay.

A.     And that it wasn't going to happen, something to that effect, it wasn't going to happen like that.  So, Mr. Watkins and the deceased, Mr. Halford, was getting ready to leave, so he decided to catch a ride with them.  He stated, and can I say this?

Q.     No.  Just respond to the questions.

A.     Okay.  So, he caught a ride.  He caught a ride.  They headed towards Clarence, stopped at the store.  From my understanding and from the way he said it, it was the first store in Clarence, which would be known to me, would be a Texaco at the intersection.

Q.     Okay.

A.     Mr. Mitchell got out, went in the store[,] bought some beer, and he never did get out the vehicle.  The driver, which is the deceased, Mr. Halford, never did get out the vehicle.  Mr. Mitchell comes back out with

15

some beer and puts that beer in the cooler. During the time Mr. Mitchell was in the store, he made a phone call, Mr. Simmons used Mr. Halford's phone to make a call. And he stated that he made a phone call.

Q. Okay. Are you sure that it's Mr. Halford's phone?

A. Not a hundred percent sure, but I know he made a phone call.

Q. Okay.

A. Okay. I'm assuming that Mitchell may have had his phone with him if he went in the store, but I know he made a phone call.

Q. Okay.

A. Yes sir. When Mr. Mitchell got back in the truck, they left. I think at that time, Mr. Simmons wanted to get dropped off in Campti. But Mr. Halford said no, we're not going to Campti, we're not going to Campti. So, Mr. Simmons stated then that they went down Greenville. They made a right, right there beside Grayson's Barbecue. As soon as they turned on Greenville, out of the curve, he stated that Mr. Halford had a bunch of money laying somewhere between his legs. Then he changes the story. And then he stated that when they made the turn, he pulled a pistol on Mr. Halford.
Q. Okay.

A. While Mr. Halford was driving, I think maybe a struggle may have ensued.

Q. And this is according to Mr. Simmons?

A. That's correct. That's according to Mr. Simmons. He continued down Greenville, out of the curve. Mr. Simmons states that Mr. Halford is telling Mr. Watkins, get the gun. Get my gun. Get my gun. And he stated that Mr. Halford was trying to open the center console, saying, get my gun. Get my gun. And then he says he shoots.

Q. Mr. Simmons shot . . .

A. That's correct.

Q . . . Mr. Halford?

A. Yes, that is correct. He shoots Mr. Halford. The truck comes to a rest. At that time, supposedly, Mr. Mitchell, Mr. Watkins, is somewhere kind of laying down on the floorboard. He states that he reaches and grabs the money out of the dash, and he jumps out the truck.

Q. Okay. And so, he never denied being there?

A.     No sir.

Q.     He never denied shooting Mr. Halford?

A.     No sir.

Q.     Okay.

A.     He puts himself there, and he stated that he shoots him.

Q.     Okay.  And this interview lasts about forty minutes?

A.     Actually, I'm going to say maybe fifteen minutes.  He talked before then.  I mean, we was [sic] just . . . casual conversation before he starts to talk about what he did, the incident.

Major Turner's involvement with the investigation ceased after his interview with Defendant.

The State then called Lead Detective, LaCour, of the Natchitoches Parish Sheriff's Office, to testify.  Detective LaCour stated that he applied for a search warrant for Mr. Watkins' cell phone after being advised that Defendant used the cell phone on the date of the incident.  According to Detective LaCour, there was a number of interest:

Q.     Okay.  What was that number of interest?

A.     It's 318-663-5547.

Q.     5547, right?

A.     Yes.

Q.     Okay.  And who is that number associated with?

A.     I've had that, personally I've had it in my work phone for several years.  The only number that I had for Ms. Rosa Simmons.

Q.     Okay.  Rosa Simmons.  And how is Rosa Simmons related to A.L. Simmons?

A.     She's Mr. A.L. Simmons' mother.

       . . . .

Q. Okay. And initial it. What time did call number 26 come in?

A. It's 12:00 p.m. 36 seconds.

Q. Okay. What date did call 26 come in?

A. June 12th, 2020.

Q. June 12th is the date . . .

A. Of the homicide.

Q. Okay. At 12:00 what was the time again?

A. 12:00 o'clock, 36 seconds.
Q. Okay. And . . .

MS. BEAIRD [Defense counsel]: Wait, did you say, what did you say? I'm so sorry.

A. 12:00 o'clock and 36 seconds, 12:00 p.m. It was right at noon.

Q. Okay. Did a witness say that A.L. Simmons used that phone on that day?

A. Yes.

Q. Okay. Who was that witness?

A. Mitchell Ray Watkins.

Q. Okay. What specifically was Mitchell Ray Watkins doing at 12:00 o'clock in Clarence when A.L. Simmons used that phone?

A. At that particular time, he was going in the store to buy some beer, but they had given Mr. A.L. Simmons a ride to Clarence.

Q. Okay.

A. Him and Mr. Halford.

Q. Okay.

Thereafter, the State called Calvin Howard to testify. Mr. Howard stated that on the date of the incident, he, "Jay" and "Gucci," gave Defendant a ride from the projects in Clarence to Campti in exchange for twenty dollars. According to Mr. Howard, they

had no knowledge of the shooting when Defendant asked for a ride. Mr. Howard stated on the date of the incident, they dropped Defendant off in Campti, but he could not recall the exact location, as he was not the driver of the vehicle. Mr. Howard testified they gave a ride to Defendant around "2:00 o'clock" that afternoon, in a white Dodge Charger.

Mr. Howard also testified regarding the statement he made to the police. Mr. Howard did not want to talk to the police at the time due to him being in the hospital receiving treatment for a gunshot wound. However, according to Mr. Howard, the police threatened to have him "arrested as an Accessory to First Degree Murder" if he did not make a recorded statement, so Mr. Howard complied.

Next, the State called Anthony Reliford, a retired employee of the Natchitoches Parish Sheriff's Department and Rosa Simmons' former neighbor, to testify. Mr. Reliford had three security cameras outside of his house, and one of those cameras faced towards the road. According to Mr. Reliford, his cameras displayed the correct time. Mr. Reliford stated that on the date of the incident, "[he] observed A.L. coming up the street" from his house, wherein they spoke to one another and went on about their business.[8]

Then, the State re-called Detective LaCour to testify regarding the jail phone calls. After listening to the recordings of the conversations between Defendant and his mother, Detective LaCour stated that the first phone call "talked about Daryl Winder" and how "he gave Daryl Winder a statement." The second phone call, Defendant talked

---

[8]Our review of the surveillance footage shows Defendant walking in front of Mr. Reliford's house at 12:19 p.m., which would have been 12:30 p.m. due to the eleven-minute time difference. The white Charger was captured on Mr. Reliford's cameras at 12:06 p.m., which would have been 12:17 p.m. due to the eleven-minute time difference.

19

about "the white Charger, bringing him home on Pasture Road."  The third phone call, Defendant talked about "try[ing] to get that bread" back.

Next, the State called Officer Axom, the first officer on the scene, to testify. Officer Axom testified that on the date of the incident, he responded to a call regarding "a vehicle in the ditch with a possible gunshot wound."  Officer Axom's patrol unit dash camera and body camera recorded footage of the date of the incident. Officer Axom testified that he started the crime scene log, which indicated the individuals who were present at the scene, including the time they arrived and departed.  Thereafter, Officer Axom discussed the statement made by Mr. Watkins, stating:

> Q.    Do you remember talking to Mr. Michael (sic) Watkins at the scene?
> A.    Yes.
>
> Q.    Okay.  And what did Michael (sic) Watkins tell you?  Do you remember?
>
> A.    Not word for word.  I can paraphrase.
>
> Q.    Okay.  Go ahead.
>
> A.    He said that he and his friend, the victim, were driving.  And they picked up someone that was hitchhiking.  He asked them to bring him to the projects.  And the victim, Mr. Halford, said he wasn't going in the projects.  Mr. Watkins said that the victim had some loose cash on the dashboard and that the subject in the backseat told him to give him the money.  And he, [ ] said that he wouldn't.  And he pulled a pistol and shot him.
>
> Q.    Okay.  Did, [ ] he specifically say where he picked him up?
>
> A.    I don't recall.
>
> Q.    Okay. All right.

Then, the State called Theresa Sykes, Defendant's cousin, to testify.  Ms. Sykes stated the evening prior to the incident, she dropped Defendant off at Ms. Loucious' house.  According to Ms. Sykes, she did not leave Ms. Loucious' house until 1:00 am the following morning.  Ms. Sykes also testified that she saw Defendant the following

afternoon, on the date of the incident, in the parking lot of her apartment complex. Ms. Sykes said Defendant was alone and they spoke to one another in passing; she was on her way to go shopping at Walmart with her sister.

Next, the State called Steven Clanton, the Natchitoches Parish Coroner. Mr. Clanton testified that on the date of the incident, he was notified by the Sheriff's Office regarding a homicide on Greenville Drive in Clarence, Louisiana. According to Mr. Clanton, whenever he arrived on the scene, he saw a "white Dodge truck just off the roadway into the ditch." The driver, who EMS determined to be deceased, suffered "a gunshot wound to his right back."

The State then called Michael Giannone, an employee of the Natchitoches Parish Sheriff's Office, to testify. Mr. Giannone testified that he transported Defendant from Winnfield to Natchitoches after Defendant was arrested. According to Mr. Giannone, whenever Defendant was placed in custody, he possessed "fifty-eight, $20.00 bills" which equated to "$1160.00 dollars," which was placed into evidence.

On the last day of trial, the State called Victor Kay, an employee of the Natchitoches Parish Sheriff's Office High-Tech Crime Unit, to testify. Mr. Kay stated that he completed the forensics on Mr. Watkins' cellular device and collected the video from Mr. Reliford's residence. According to Mr. Kay, Detective Kilpatrick mentioned that the time of the video footage was "about eleven minutes slow," so, he "check[ed] the live feed of the DVR and compare[d] the time on that to current actual time." Mr. Kay's finding showed that the footage "would have been eleven minutes slow."

The State called Detective Kilpatrick of the Natchitoches Parish Sheriff's Office to testify. According to Detective Kilpatrick, his primary involvement in the case dealt with reviewing the surveillance footage from Mr. Reliford's residence. Detective Kilpatrick testified as to the significance of the video footage, stating:

21

A.   Mr. Reliford's video faces Pasture Road, so you're able to see traffic coming in and out.  And I observed a white Dodge Charger that I'd been advised was a potential suspect vehicle pass coming from the Campti area towards the Simmons's residence.

Q.   Okay.  And do you have a, was there a corresponding time shown by that video?
A.   There was.

Q.   What was it?

A.   I believe it was 12:00 shortly after 12:00 p.m.

The State then called Detective David Lofton of the Winnfield City Police to testify.  Detective Lofton stated that on the night of the incident, he and two other officers had received word that Defendant was on the property of Maplewood Apartments.  They arrested Defendant between 2:00 and 3:00 a.m. the following morning.  Detective Lofton stated that he was not the arresting officer but that he transported Defendant to the police department so that he could be booked with Natchitoches Parish Sheriff's Office.

Following the testimonies of the State's witnesses, the defense called Monica Hayes, Defendant's neighbor, to testify.  According to Ms. Hayes, she saw Defendant "coming from his mama['s] house" the morning of the incident.  She testified that they spoke to one another and that he continued his walk down the street.  Ms. Hayes had no knowledge of where Defendant was walking to and at what time she saw him.  According to Ms. Hayes, she saw Defendant after the mail was delivered to her house.

Next, the defense called Rosa Simmons, Defendant's mother, to testify.  Ms. Simmons stated that she met Ms. Loucious through Defendant's father, Robert Evans, over twenty years ago.  Ms. Simmons testified that Ms. Loucious was involved in Defendant's life as a child, but as he got older, Ms. Simmons did not allow Ms. Loucious to be around him due to the activities she engaged in.

22

Regarding the date of the incident, Ms. Simmons recalled the following:

A.     The time I got up, what I remember is I got up, washed a couple loads of clothes, folded up clothes, went outside. A.L. remember him, Damien was [a]sleep. My grandson woke up. Me and my neighbor went outside and talked for a little while. A.L. was, I was fussing at A.L. about putting up clothes, and I can't recall if the barber called my phone or my neighbor's phone, because my neighbor and my boys mainly went to go get a haircut at the same time, same date, you know, the same date. And we got the phone call, because COVID had hit really bad, and I wouldn't take my grandson [to] the barbershop around a lot of people. So, me and the barber guy had an understanding where, call me whenever you're not busy, you know, when there's, you know, and he'll do it, like, close to lunchtime or whatever. And he called, like I said, I don't remember which phone he called, but he called us, and I went in the house and woke up Damien and told Damien to get up because it was time to go get, go get his haircut, the guy had just called.

Q.     Well, let me say, how old was Damien at the time?

A.     Three years ago. He's 21 now. What, 19 I think, 18. Right at 19. I think he was 18 going on 19 in June.

Q.     Okay. All right.

A.     So, excuse me, and my grandson had my phone. I was fussing with A.L. to get the clothes because him and Damien shared a room at the time, and I was telling him they took turns putting up the clothes. And I told him, get the clothes off the couch because I had folded them up, [get] them off, and go put them up. And he was just, me and my kids have a relationship where he's always been one of my worst, and him and Damien's always been my worst kids. They would pick and push, pull and drag me through the mud to get them to do something, just minor things, but it's in a playful way. And he was just giving me a hard time that morning, well, you know, around that afternoon, whatever, and he kept on going in and out the door, and I was trying to get dressed and everything, get my grandson dressed, and I got my grandson dressed. I was waiting on my neighbor to get dressed and Damien to get up and get dressed. I'm fussing at A.L. to get the clothes and get them put up. My daughter drives up, I walked outside to go get my phone that my grandson had left outside, and she asked me what I was fixing to do, and I told her, I said, I'm trying to get your brother ready so we can go. And I'm waiting on the neighbor to come on so I can go take him to Natchitoches to get a haircut. And she says she's fixing[sic] to go to Natchitoches. And I say, hey, why won't you take, you know, which my grandson is my daughter's son. I said, you want to take, we call him C.J., you want to take C.J. to Natchitoches with you and take him [to] the barbershop and let him go head on and get his haircut while there's nobody there, you know. And she did. She got him, I got him out of the house. She never got out of the vehicle. Got C.J. out

[of] the house, put him in that car, and him and her left. I went back in[to] the house to go finish getting dressed and rushed Damien to get up, you know, to come on, finish getting dressed. And A.L. was at the house, and he was still going in and out of the house, and he came back in the house, and when Damien came up the hallway and went to go outside, I told him to go and see [whether] they were dressed. And he says, okay. And I told A.L., I said, you need to go put your clothes up, because I don't want to come home with the clothes still in my living room on the furniture. And at that time, go on, you know, old woman, go on put the clothes up. You know, go and do what you do. You know what your job is around here and all this type of stuff. And he, I said, okay, I said, I'm gonna[sic] put you and the clothes outside. And he just wouldn't do it, you know, just irritating me. And I picked, I went to go out the door, and I picked the clothes up and I put them in his hand. He was standing up at the door, and I just pushed him in, I put the clothes in his arms and pushed him out the door and I went out the door, and I locked my door.

Ms. Simmons testified that shortly after dropping her son, Damien, to the barbershop, she received news regarding the shooting. However, Ms. Simmons could not recall when she found out about the incident nor when she left her house to go to the barbershop.

## ASSIGNMENT OF ERROR:

In his only assignment of error, Defendant argues that the evidence adduced at trial failed to prove beyond a reasonable doubt that he was guilty of the second degree murder of Mr. Halford.

After viewing the evidence in the light most favorable to the prosecution, we find any rational trier of fact could have found the essential elements of the crime of second degree were met beyond a reasonable doubt. The State had an eyewitness, Mr. Watkins, who named Defendant as the shooter. Mr. Watkins' identification of Defendant as the shooter is direct evidence of Defendant's guilt:

> Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Austin*, 399 So.2d 158 (La.1981). Where there is direct evidence, the trier of fact

weighs the credibility of evidence and the reviewer under *Jackson* defers to that trier of fact, assuming the proven facts most favorable to the State. Where an essential element of the crime is not proven by direct evidence, La.R.S. 15:438 applies. That rule restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. *State v. Shapiro,* 431 So.2d 372 (La.1983) (on rehearing).

*State v. Lilly*, 468 So.2d 1154, 1158 (La.1985).

Furthermore, Ms. Loucious testified to Defendant spending the night at her house and being the person who left with the "white man" and "black man" to go to the store. Additionally, Ms. Sykes, Defendant's cousin, stated that she dropped Defendant off at Ms. Loucious' house the evening before the incident, which confirmed Defendant's presence at Ms. Loucious' house. Moreover, the cell phone records corroborate Mr. Watkins' testimony as to Defendant using Mr. Watkins' phone to call his mother, placing Defendant in the vehicle with Mr. Watkins and Mr. Halford. Captain Winder and Major Turner also testified regarding Defendant's statement as to what happened after his arrest. Although the defense argues that the statement made by Defendant was never recorded by Captain Winder or Major Tuner, the record evidences that Defendant admitted to his mother on a recorded, jail phone call that he gave a statement to Captain Winder and Major Turner but did not allow for them to record him. However, Defendant maintains his innocence.

This court has stated the following regarding a jury's rejection of a defendant's hypothesis of innocence:

With respect to a jury's rejection of a hypothesis of innocence, our supreme court in [*State v.*] *Calloway*, [07-2306 (La. 1/21/09),] 1 So.3d [417] at 422 (citations omitted), concluded:

[W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility

25

determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'"

The jury's decision to reject the defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned.

*State v. Jackson*, 14-9, pp. 12–13 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639, (fourth alteration in original), *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066.

Likewise, we find the jury's rejection of Defendant's hypothesis of innocence in the present case was based upon its rational credibility and evidentiary determinations. Considering the testimony that Defendant was the individual who received a ride from Mr. Halford, we find the jury's rejection of this hypothesis of innocence was reasonable.

Accordingly, after viewing the evidence in the light most favorable to the prosecution, we find any rational trier of fact could have found the essential elements of the crime of second degree murder were met beyond a reasonable doubt. For these reasons, we hereby affirm Defendant's conviction and sentence of life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.

**AFFIRMED.**